### KNOTT v. EVENING POST CO. et al.

#### (Circuit Court, W. D. Kentucky. July 20, 1903.)

1. CORPORATIONS—ASSETS—TRUST FUND.
    While the capital stock and property of a corporation are regarded as a trust fund for the payment of its debts, they are not a trust fund for the payment of stockholders on dissolution.
2. SAME—LIQUIDATION—RECEIVERS.
    Under Gen. St. Ky. § 561, authorizing a corporation, on termination of its charter by lapse of time, to continue its business for the purpose of closing its affairs, the fact that a corporation, just prior to the termination of its corporate existence, for the purpose of liquidation, passed a resolution appointing a certain trust company as a liquidator, and providing for the sale of the corporation's property and assets, in the absence of fraud, did not constitute a ground for the appointment of a receiver at the instance of a dissenting minority stockholder.
3. SAME—STATE AND FEDERAL COURTS—CONFLICTING JURISDICTION—DISTRIBUTION OF ASSETS.
    Where, in an action by a stockholder in the state court against the corporation, the only relief which could have been granted on the case made by the complaint was an order requiring an inspection of the corporation's books, and after the institution of such action another suit was instituted in the federal court by a creditor of the corporation, alleging its insolvency, and in such action a receiver of the corporation was appointed, who rightfully acquired possession of the corporation's property before a receiver had been appointed by the state court in the stockholder's action, the federal court, having first acquired jurisdiction of the res, would not surrender the property to the receiver appointed in the state court, for distribution.

Humphrey, Burnett & Humphrey, for complainant.
Helm, Bruce & Helm, for defendants.
Dodd & Dodd and Kohn, Baird & Spindle, for petitioner Louisville Trust Company, receiver.

EVANS, District Judge. The Evening Post Company, a corporation, was organized under the provisions of chapter 56 of the General Statutes of Kentucky on the 1st day of May, 1878. By its articles of incorporation it was to continue in existence for a period of 25 years, namely, until May 1, 1903. The complainant, a citizen of Missouri, holding the past-due notes of the company for $6,000, brought a suit at law against it in this court for the recovery of a judgment thereon. The company having confessed the indebtedness and its nonpayment, judgment was rendered accordingly, and soon afterwards an execution of fieri facias which issued thereon was returned nulla bona. This action in equity, in the nature of a cred-

¶ 3. Conflict of jurisdiction between federal and state courts, see note to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356.
See Courts, vol. 13, Cent. Dig. § 1407.

itors' bill, was instituted on May 27, 1903; and on the following day, upon the motion of the complainant and by the consent of the defendants, Lewis C. Humphrey was appointed the court's receiver, and was directed, as such, to take possession of all the property of the Evening Post Company, which was accordingly done by him on that day. That property, before the issual of the execution, had been placed in the hands of the defendant the Columbia Finance & Trust Company, as liquidator, under a plan for winding up the affairs of the Evening Post Company, adopted on April 30, 1903, by the almost unanimous vote of its stockholders at a meeting held for that purpose. On the 28th day of June, 1903, the cause was referred to the master, to advertise for, ascertain, and report to the court the debts proved against the company. On the 6th day of July, 1903, the master made a partial report, showing the names of the creditors who up to that time had proved their claims, and the amounts of the latter, which aggregated $119,163.51. The gross indebtedness, when all the claims shall be proved, will probably increase that aggregate to $120,000 or over.

At this stage of the proceedings in this court, the Louisville Trust Company, alleging itself to be the receiver of the Evening Post Company, appointed by the judgment of the Jefferson circuit court, chancery branch, First Division, rendered June 27, 1903, in the action therein pending of Bruce Haldeman and others, executors of the will of W. N. Haldeman, deceased, against the Evening Post Company and others, presented, and was given leave by the court to file, its intervening petition herein; and, having filed it, the said trust company thereupon moved this court for an order directing its receiver, Lewis C. Humphrey, to turn over to the state court receiver all the property of the Evening Post Company in his hands, and based this motion upon the ground, stated generally, that the state court, in the proceedings therein pending, had first acquired jurisdiction over the assets and property of the Evening Post Company, and the consequent right to adjudicate all questions relating to its administration and distribution among the parties entitled to share therein.

The application thus made raises the question of which of two courts of concurrent power shall control the administration and distribution of the assets of the Evening Post Company. Such conflicts are always somewhat embarrassing, not, perhaps, because either court is at all tenacious of its rights, or especially anxious to perform the labors required, but rather because litigants become embittered, or imagine that one court will take a view of the law more favorable to one than to the other of the parties in interest. The courts themselves, with the fullest respect for each other, and with a natural tendency to abdicate rather than to seize upon burdens, must consider merely what are the rights of the court and the litigants under the established principles of law applicable to such cases. With nothing but the highest respect for the state court in this instance, coupled with the fullest determination to yield to it everything that established principles of law demand, I enter upon the consideration of the very interesting, though perhaps not novel, questions involved.

Accompanying the intervening petition of the Louisville Trust Company, the receiver appointed by the state court, is a transcript of the record in the case of Haldeman's executors against the Evening Post Company, the Columbia Finance & Trust Company, trustee of the Evening Post Company, Richard W. Knott, J. M. Atherton, John R. Knott, Eugene Q. Knott, and Laura G. Boyle, defendants, the last five of whom are called in the petition "individual defendants." This suit in the state court was commenced on May 12, 1903. The petition therein is too long to be copied in full in an opinion, but in substance it avers the following facts, and nothing more, namely, that in June, 1898, their testator, W. N. Haldeman, acquired 48 shares of the capital stock of the Evening Post Company, which at his death came to their hands as part of the assets of his estate; that the capital stock of that company—$60,000—was divided into 600 shares, of $100 each, which were claimed to be owned by certain of the defendants, as follows, namely, Richard W. Knott, 427 shares; J. M. Atherton, 65 shares; Laura G. Boyle, 50 shares; John R. Knott, 5 shares; and Eugene Q. Knott, 5 shares—besides the 48 shares owned by the plaintiffs; that under its charter the corporate existence of the company expired May 1, 1903; that the individual stockholders named, other than the plaintiffs, had for years been the officers and directors of the company, and had operated it as their own private property, without any meeting of the stockholders or election of directors; that being informed about April 25, 1903, that the charter of the company was about to expire by its own terms, the plaintiffs repeatedly demanded, both verbally and in writing, the right, as stockholders, to examine and inspect the books and affairs of the company, but that they were always absolutely and positively refused the right and opportunity to do so; that they demanded repeatedly, and were as often refused, a statement of the assets and liabilities of the company, and full data respecting the same; that a meeting of the stockholders was called by the defendant for April 30, 1903, which they attended, and that over their protest the stockholders adopted a resolution in the following language:

"Whereas, the charter of the Evening Post Company will expire on the first day of May, 1903; and, whereas, it has become necessary to have all the assets of every character of the company sold for the purpose of paying its debts and distributing the surplus, if any, among the stockholders; and, whereas, it is impossible to properly advertise and sell said property by the 1st of May next; therefore, be it resolved: First. That the Columbia Finance & Trust Company be, and it is hereby, appointed liquidator of the affairs of the corporation, with directions to operate for the use of the stockholders the affairs and business of said corporation as they have been operated until the property can be properly advertised and sold, and the possession thereof delivered to the purchaser. Second. That prior to the said sale the liquidator shall cause to be made for the use of the stockholders a comprehensive statement of the assets and liabilities of the corporation, and furnish said stockholders with a copy of said statement. Third. That the said liquidator shall, in its advertisement, specify the nature of the articles to be sold, and shall make such sale for cash, to be paid on the delivery of possession, and shall require of the purchaser that he deposit a certified check for an amount equal to one-third of the total purchase price, which the liquidator shall hold and credit upon the purchase price when the sale is consummated, or, if for any reason it shall be set aside, return to the bidder. If the said bidder to whom the property is knocked down shall fail at once to deliver to the liquidator the

certified check as herein provided, the liquidator shall immediately resell the property, and refuse to receive bids from said former bidder. Fourth. Said liquidator may, in his discretion, employ an auctioneer or other agent necessary or proper to be used in the sale of the property. Fifth. Until said sale, and during the operation of said property, said liquidator is given full authority and permission to employ such agents and persons as may be necessary to properly, conveniently, and economically operate the property, and keep an account of all its expenses, and take vouchers therefor. And after the property has been fully administered it shall make out a comprehensive account of its acts and doings, and shall furnish a copy thereof to each of the stockholders. Sixth. The said liquidator shall from the proceeds of the sale of the property pay all debts of the corporation, and the balance, if any, shall be distributed among the stockholders according to their legal rights."

The petition further alleged that on April 30, 1903, the said liquidator qualified as such; that the plaintiffs renewed their demands to it, and that it also has denied and refused to grant any of them; that they do not know and are not advised as to any indebtedness of the company, nor how it was created or secured, nor are they advised of the assets of the company; that they can only obtain such information from the books of the company, which are under the control of the individual defendants, who positively refuse to allow the plaintiffs any access thereto or any statement of their contents; that they are informed and believe that the defendants are still conducting and operating the business of the company, and at great loss and expense; that they have the right to inspect at reasonable times the books and affairs of the company, and to ascertain its financial condition, and that they are wrongfully denied that right by the defendants, who also refuse to give them any statement of the financial condition of the company, or of its assets and liabilities; that the liquidator is advertising and calling upon all the creditors to present their claims, properly proved, by June 1, 1903; that they are advised that the individual defendants have taken over to their own use and are now using all of the property and good will of the company; that in law and in equity and in good conscience they are entitled to an inspection of the books and affairs of the company, but, though often demanding it, they are always refused; that the assets of the company are, or should, in right and law and equity, be of the value of $60,000, at least, and that the maximum liabilities under the charter should not be over two-thirds of that sum, or $40,000; that they do not know and cannot state what either the assets or the liabilities of the company are, other than the capital stock; that, notwithstanding the charter fixed the maximum limit of indebtedness of the company at $40,000, yet the total indebtedness exceeds $109,000, and that the individual defendants constitute all, or nearly all, of the creditors of the company; that the books of the company show, or should show, the extent, character, and origin of the indebtedness, and the nature of the transactions out of which they grew, and that without an inspection of the books and papers of the company they cannot ascertain the facts, nor whether the debts are valid and binding obligations of the company, and that notwithstanding the individual defendants are managing the affairs of the company, and have the custody of its books and papers, they refuse plaintiffs all access to them, and all information from them, and

all right and opportunity to inspect them; that to the end that the affairs of the company may be wound up and liquidated, and that they may be fairly dealt with according to law, an inspection of the books is necessary; that proper information to this end cannot be derived from a mere copy of the books and papers, nor from the conclusions and statements of an accountant or bookkeeper; that the individual defendants claim to be all the creditors of the company, and the complainants know of no one else who claims to be a creditor thereof, and they are all called upon to set up and prove their demands, to the end that the affairs of said company may be liquidated and settled in that suit; that it is impracticable and impossible to have a fair, just and proper accounting and settlement of the business and affairs of the Evening Post Company, except in that suit, and that, in view of the persistent conduct of the defendants therein, the plaintiffs will not and cannot be informed or advised of the assets and liabilities of the company until the defendants are compelled to furnish such information, and to allow the plaintiffs to inspect and examine the books, accounts, and affairs of the company; that the individual defendants are claiming and insisting that there is a great value attached to the good will, name, and the operative plant of the Evening Post Company, including the telegraphic and other correspondence facilities built up, acquired, and established by it, which would be endangered and probably lost if the publication of said newspaper by it were abandoned, and that, in order to preserve it and to get the benefit of it, the defendants' claim that the newspaper should be operated pending the closing up and liquidation thereof, to the end that its good will, name, and facilities aforesaid may be sold to the best advantage, but the plaintiffs state that they are not informed and have no means of knowing as to what the value of the good will, name, and facilities aforesaid are, nor as to whether there is any value thereto, and that they cannot have or form an opinion touching the same without a full and free inspection of the papers, documents, books, and accounts of the Evening Post Company.    The prayer of the petition is in this language:

"Wherefore, the premises considered, the plaintiffs pray for a settlement of the accounts of the Evening Post Company, and of the Columbia Finance & Trust Company as liquidator thereof, herein, and that this cause be referred to the commissioner of this court to audit, state, and settle the accounts of the Columbia Finance & Trust Company as trustee or liquidator of the affairs and business of the said Evening Post Company; that a full, true, and correct accounting of the business and affairs of the said Evening Post Company, and of the liabilities against the same, be ascertained and reported, and the assets sold and disposed of, and distributed amongst the parties thereto according to their respective interests.    Plaintiffs further pray that pending this action, and until the final liquidation of the affairs of the Evening Post Company, and the sale of its plant and assets, that the court herein determine as to whether or not the affairs of the said Evening Post Company should be continued in operation, and, if so, that the operation of the said plant be conducted under and subject to the orders of the court herein. And the plaintiffs further pray that a mandatory preliminary order be entered herein, commanding and directing the defendants, and each of them, to allow the plaintiffs reasonable access to, and an examination of, the books, papers, documents, and affairs of the said Evening Post Company, including all documentary information in connection therewith which is in the possession of the defendants, or any of them.    And the plaintiffs further pray for their costs herein expended, and for all such proper and equitable relief as the nature of the case may demand."

It appears also from the transcript accompanying the intervening petition that the Evening Post Company and the individual defendants on May 23, 1903, filed an answer to the petition in the state court, in which they expressly denied many of its material allegations, and, contesting the rights claimed by the plaintiffs, among other things urged, and at the argument they insisted, that the purpose of the plaintiffs was to acquire information which would benefit their own publications, viz., the Courier-Journal and the Times, at the expense of their competitor, the Evening Post, but, while the last-named matter could be given such weight as might be thought to be proper by the state court to which it was addressed, it seems to be quite immaterial upon any issue before this court. It also appears from the transcript that the Columbia Finance & Trust Company on May 23, 1903, filed its answer in the state court proceeding, and much significance seems to be attached to the fact that it therein states that it submits itself to the jurisdiction of the court, and that it will, of course, obey all its orders, although at the same time it protests that it will be burdensome and unnecessary to subject the corporation to the costs and expenses of winding up its affairs in a judicial proceeding. Undue importance should not be given to this submission to the jurisdiction of the court by the answer of the liquidator, because, at last, its general language must be confined and limited to the scope of the plaintiffs' petition, when fairly ascertained.

Upon a preliminary hearing the learned judge of the state court ruled that the plaintiffs were entitled to inspect the books, etc., of the corporation, and on the 4th day of June, 1903, appropriate orders to that end were made to enforce that right. However, when the persons against whom those orders were directed were applied to, it was developed that they no longer had any control over the books, because previously thereto, viz., on May 28, 1903, they had all been turned over to the receiver of this court pursuant to its orders. On the 27th day of June, 1903, on the motion of the executors of W. N. Haldeman, the state court appointed the receiver who has made the motion we are now considering, for an order requiring this court's receiver to turn over to the state court's receiver all the assets, etc., of the corporation, not at all for the inspection of the books, but altogether for the purpose of having those assets administered and distributed by the state court. I have been at pains to state accurately the averments of the petition in the state court suit, including even its repetitions, in order that we might certainly get its full scope, and give it effect accordingly. While the prayer of the petition is much broader, the real scope of the pleading—the subject-matter of the suit— must be determined by such of its averments as present a valid basis for the relief asked, for it cannot be that any relief can be properly granted, except such as may logically follow if the averments of the pleading are true—that is to say, such as may be appropriate to the case made by the petition.

Upon an application of this character, the proceedings in the state court, upon which its receiver bases his claim, are certainly open to inquiry so far as it may be necessary for the court applied to, to ascertain the merits of the application, for, if it acted upon mere sug-

gestion only, it might do palpable injustice to the rights of litigants. Proceeding upon this view, and industriously endeavoring to ascertain the full scope of the litigation in the state court, I have not been able to find such averments in the petition of Haldeman's executors as would authorize any relief, except that of an inspection of the books, papers, and affairs of the Evening Post Company. That relief seems to be absolutely all that the plaintiffs therein could legitimately obtain on the case made by their pleading. With the claim to that relief this court has neither disposition nor right in the slightest degree to interfere. It is only because it is asked to surrender property in its possession, and which has been seized at the suit of creditors, to the end that it may be subjected to their demands, that we look into the proceedings of the state court at all, for otherwise our examination of them might be unauthorized. While, as I think, the scope of the petition in the state court was limited to the claim of the plaintiffs to examine the books, etc., it is insisted that the prayer broadens that scope; but it seems to be a sufficient answer to this to say that the rights of a litigant must be measured not alone by his prayer for relief, but by the case made by the facts stated in his pleading.

It is also insisted that the petition shows that the resolutions appointing the liquidator created a trust, and the liquidator a trustee, and that the petition, to the end that the trust should be enforced and the affairs of the corporation wound up, called upon the defendants and all others who are creditors to prove their debts, so that the affairs of the company might be settled in that suit. Do these matters afford any grounds for surrendering the corporate assets to the state court receiver?

While the capital stock and property of a corporation are regarded as a trust fund for the payment of its debts, it can hardly be maintained that they are a trust fund for the payment of stockholders. Their right is ownership, and the trust-fund doctrine does not reach them. It is to be remembered that the plaintiffs in the case in the state court are stockholders, and nothing more; that they own 8 per cent., and no more, of the capital stock; that they do not allege that the corporation is insolvent; and that their petition does not claim that they are entitled to the appointment of a receiver, nor to a seizure of the corporate assets, upon any ground whatever. Their demand—possibly a most reasonable one—was to inspect the books, etc., so that they could understand the condition of the company in which they had an interest. The corporate existence of the company was on the eve of expiration, and a very large majority of the shareholders desired either to reorganize so as to continue the business, or else in some way to secure as large a price for its assets as possible. While the 25 years expired May 1, 1903, yet section 13 of chapter 56 of the General Statutes of Kentucky, and section 561 of the Kentucky Statutes, which is an amendment thereof, fully authorize the corporation to continue to act, though only for the purpose of closing up its business. No precise mode for doing this is prescribed, and probably was not at all desirable; but all corporations, in all stages of their existence, must act by agents, and in this instance,

in order that the business of the corporation might be closed, it, at a full meeting of its stockholders, adopted the plan of having it done by a responsible trust company as an agent, called a "liquidator," selected by themselves. This company was an agent merely to perform the legitimate work and duty of closing up the business of the corporation. While, in a general way, all agents are trustees, an appointment of one does not make the corporate assets a trust fund in this case, any more than would the appointment every day of corporate agents constitute them trustees, in such a sense as to put all the corporate assets into the shape of trust funds, to be administered in equity, unless other most material circumstances arise. Ninety-two percent. of the stock was voted in favor of the plan adopted in this case, while only 48 shares, owned by Haldeman's executors, voted against it. The authorities all agree that when one buys the stock of a corporation he impliedly agrees to submit to the rule of the majority, and that, if the acts done by a majority are intra vires and without fraud, they are binding. Dudley v. Kentucky High School, 9 Bush, 576; Cook on Corporations, § 684; Clark & Marshall on Private Corporations, § 628. Hence we can see no reason why, as between the shareholders in this case, the plan adopted was not entirely permissible, especially as it was evidently supposed to be an expeditious and inexpensive way of accomplishing the desired result. To permit 8 per cent. of the shareholders to defeat this plan would be to give control to a small minority, rather than to a large majority; and that, too, in a case where, at least on its face, no perceivable wrong to any one appeared to inhere in the plan adopted. Of course, the chancellor may well be applied to by any shareholder, whether in a minority or not, to prevent the destruction or injury of any of his rights by wrongdoing, but no right of his is violated by merely outvoting him upon a matter fairly within the rights of those who do it. An appeal to the courts in such a case can generally only be made when fraud or some violation of law or of the rights of some person in interest can be alleged. As nothing of that sort can be fairly said to be charged in this instance either against the liquidating agent or the corporation, unless it be the refusal of inspection of the books, it seems too clear for further argument that there is nothing charged in the petition of Haldeman's executors which would in any way entitle them to have the state court seize the corporate assets. It might be that under some circumstances a court of equity could remove an unfaithful trustee by a direct proceeding for that purpose, but while it might do that, and appoint another in his stead, it would not necessarily follow that it could seize the corpus of the trust fund because an agent has been unfaithful. Nor could such seizure be justified by any mere failure or refusal to allow an inspection of books. But here there can be no claim, and there is none, that the liquidating agent was corrupt or unfaithful. As before remarked, no express mode for closing the business of corporations is prescribed by the statute. That matter is wisely left to those most interested to do it in such way as may suit them, subject, of course, to the right of any one to go into court if his rights are violated. But I conclude that there is no fact alleged in the state court

proceeding which would give that court any right to seize the property of the Evening Post Company, nor to give any relief except that of inspecting the books, etc.—a right of the executors of Mr. Haldeman, which that court alone, in the then aspects of the case, could determine. And it is certain that nothing else was attempted, and that no seizure was made until after the property of the corporation was all in the hands of the receiver of this court.

But even if these views be unsound, the case goes far beyond this phase of it. The complainant in the creditors' bill filed in this court was not a shareholder, but a judgment creditor. Creditors are to be cared for before the stockholders who owe them. The complainant creditor, a citizen of Missouri, on behalf of himself and all other creditors of the corporation, exercising a right plainly given him by the laws of the United States, in the regular way, applied to this court for the protection and enforcement of his rights before it appeared that any stockholder was doing more than seeking to obtain information as to the status of the affairs of the corporation. In due and orderly course, and by the proper and legitimate processes of the court, the property of the debtor was seized for the purpose of satisfying the demands of its creditors one month before the state court appointed its receiver, and this court has ever since had it in due course of administration.

As already indicated, the petition filed in the state court, even if we disregard the answer thereto, and assume its averments to be true, does not state facts which would authorize a court of equity to seize the corporate assets at the instance of a stockholder, nor did the pendency of that suit per se create a lien thereon, nor, indeed, was anything done or attempted in the state court which brought the assets of the corporation within the grasp of the law, either actually or potentially, within the meaning of those terms as used in cases where there is a conflict of jurisdiction, until some weeks after those assets had been placed in the hands of the receiver of this court. After that was done, though no receiver had been asked for in plaintiffs' petition, the state court receiver was appointed on their motion.

Stated broadly, the question to be determined is this: Which of the two courts, under the facts stated, first acquired jurisdiction over the assets of the Evening Post Company? I mean over the assets, and not merely over the corporation, for the purposes of securing the relief to which the stockholder was entitled on the facts stated in the petition—a distinction most important to be remembered. Was it the state court, in the stockholders' suit, where no receiver was originally asked for, and where the real relief sought by a mere stockholder was the right to look at the books, or was it this court, wherein a judgment creditor in a direct proceeding first caused a judicial seizure to be made of the property itself in order to subject it in due course to the corporate debts? Put in another form, the question might be this: Does anything appear from the record of the proceedings in the state court which would, notwithstanding the undisputed facts appearing from the record in this court, entitle the stockholder to insist that the rights first obtained by a judgment creditor

should be subordinated to those of the mere stockholder? It is insisted that the authorities unanimously hold that, where the same subject-matter is brought before different courts of concurrent power, the court which first acquires jurisdiction, and especially the first which either actually or potentially acquires jurisdiction or control over any property which may be involved or seized, is entitled to decide every question, and that comity requires the other court to yield. Undoubtedly this general proposition is as true as it is elementary, but it has frequently occurred to me, in investigating this and similar questions, that in no class of cases is it more necessary to remember what was said by Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, and cited by Chief Justice Fuller in delivering the opinion of the court in Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759. The language referred to was this:

"It is a maxim not to be disregarded that general expressions in every opinion are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

In Peck v. Jenness, 7 How. 612, 12 L. Ed. 841, an attachment issued from the state court had been levied on property of a defendant some time before he went into bankruptcy, and the assignee in bankruptcy afterwards applied to the state court to turn over to him the property thus levied upon; but the Supreme Court held that he was not entitled to have it done, because before the bankruptcy proceeding was instituted another court had seized the property by its processes, and then had it in its custody. It may be observed that the bankruptcy law then in force was different from the present statute, but the same result would necessarily still follow if an attachment should be levied more than four months before an adjudication. Orton v. Smith, 18 How. 263, 15 L. Ed. 393, was a case where there were conflicting claims of title to certain lands in Wisconsin, and some of those claims were being litigated in the state court, when the complainant filed a bill in equity in the federal court to quiet his title to the land, and enjoin one of the defendants from proceeding in his case previously pending in the state court about the same land. The Supreme Court held that this could not be done. It is rarely the case that one court can enjoin proceedings in another. In Taylor v. Carryl, 20 How. 586, 15 L. Ed. 1028, a vessel had been seized under an attachment issued from the state court, when a libel was filed against it in the federal court by seamen who claimed wages, and the vessel was sold under the judgment of each court. When the question was brought before the Supreme Court, it held that, as the state court first seized the vessel, it could not be divested of its power over it by the subsequent proceedings in the federal court, even if the case was one in admiralty, and that the purchaser at the sale under the judgment of the state court acquired the title

as against the purchaser under the judgment of the federal court. In Shaw v. Lyman (C. C.) 79 Fed. 2, the question appears to have been whether the pendency in the state court of a suit between the same parties on the same cause of action was a bar to a creditors' bill in the federal court to fix the personal liability of directors and stockholders in a corporation. The court answered it in the negative. Owens v. Ohio Central R. Co. (C. C.) 20 Fed. 10, presented a case of several applications to different courts by different parties for the appointment of a receiver for the same railroad; and, each court having acted, Judge Jackson, in West Virginia, held that that receiver should be preferred who was appointed in the suit in which process was first served. In Shields v. Coleman, 157 U. S. 169, 15 Sup. Ct. 570, 39 L. Ed. 660, it was held that a Circuit Court of the United States has not the power to appoint a receiver of property already in the possession of a receiver duly and previously appointed by a state court, and cannot rightfully take the property out of the hands of the receiver so appointed by the state court. In Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 33 L. Ed. 399, it was held that, when a state court had entered upon the trial of a criminal case of which it had jurisdiction, a federal court would not interfere by writ of habeas corpus. In Hitz v. Jenks, 185 U. S. 155, 22 Sup. Ct. 598, 46 L. Ed. 851, the controlling question, as stated by the court, was whether the sale of land under a deed of trust stands in the way of its redemption by a party in interest upon payment of the debt secured by the deed of trust, and the court answered the question in the affirmative. The questions decided in the very recent case of Messrs. Watts & Sachs, 23 Sup. Ct. 718, 47 L. Ed. ——, can have no application to this case, although it is true that in its opinion the Supreme Court remarked that, as the assets of the bankrupt under the bankruptcy law belonged to the trustee, comity seemed to require that the state court should have promptly turned them over to that officer, notwithstanding the pendency of the litigation in that court. In the case of Mutual Reserve Fund Association v. Phelps, 103 Fed. 515, it was supposed by this court that the appointment of the state court receiver was void, as having been made without jurisdiction, under the Kentucky practice, and therefore that the case was not covered by section 720 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 581], forbidding injunctions against proceedings in a state court, but the court of superior jurisdiction thought otherwise. Yet these, together with the case now to be mentioned, are the authorities mainly relied upon by the counsel of the state court receiver, and also, indeed, by the learned judge of the state court, as the basis of the conclusion reached by him in the opinion delivered in that court. That other case is Farmers' Loan & Trust Co. v. Lake Street R. Co., 177 U. S. 51, 20 Sup. 564, 44 L. Ed. 667, in which it appears that the Farmers' Loan & Trust Company on January 30, 1896, filed in the federal court its bill as trustee to enforce a mortgage executed by the railroad company. Subsequently, but on the same day, the railroad company brought its suit in the state court to remove the trust company as trustee, upon certain grounds alleged in its bill. A petition was filed for the re-

moval of the case to the federal court, but the state court refused to do it. Subsequently the transcript was filed in the federal court, and a motion to remand the case was overruled. However, the state court proceeded in the cause, and rendered its decree in favor of the plaintiff, and from that decree an appeal was prosecuted to the Supreme Court of the United States. That court, waiving the questions of the right of removal, held that the state court had erred in enjoining the Farmers' Loan & Trust Company from acting as trustee, and in enjoining it from proceeding in the suit in the federal court. In the opinion in this case may be found general expressions which could be cited in support of either side of the present controversy.

Coming now to the consideration of the question from the standpoint of the judgment creditor and of the receiver of this court, it is difficult to see how their contention is antagonized by the cases of Peck v. Jenness, Taylor v. Carryl, or by Shields v. Coleman, or, indeed, by any of the cases cited on behalf of the state court receiver, although in some of them there is the general statement of the doctrine that the court first getting jurisdiction is entitled to control the litigation. The three cases last named would, indeed, seem quite strongly to favor the contention of the side opposed to the state court receiver's motion. In Wiswall v. Sampson, 14 How. 52, 14 L. Ed. 322, it was held that, where real estate is in the custody of a receiver appointed by a court of chancery, a sale of it under an execution issued on a judgment at law from another court is illegal and void. In Freeman v. Howe, 24 How. 451, 16 L. Ed. 749, the marshal had levied an execution issued from the federal court on certain railroad cars, which were afterwards taken out of his hands by the sheriff under a writ issued in a replevin suit instituted in a state court. It was held that this was entirely irregular, and on page 455, 24 How., 16 L. Ed. 749, the court said that:

"According to the course of decision in the case of conflicting authorities under a state and federal process, and in order to avoid unseemly collision between them, the question as to which authority should for the time prevail did not depend upon the rights of the respective parties to the property seized, whether the one was paramount to the other, but upon the question, which jurisdiction had first attached by the seizure and custody of the property under its process?"

The doctrine of this case again came under review in the case of Covell v. Heyman, 111 U. S. 176, 4 Sup. Ct. 355, 28 L. Ed. 390. There the plaintiff brought her action of replevin in the state court against a deputy marshal of the United States who had levied upon the property in question under an execution against one Adolph Heyman. Judgment having been rendered against the deputy marshal, he sued out a writ of error to the Supreme Court, which reversed it, and at page 180, 111 U. S., 4 Sup. Ct. 357, 28 L. Ed. 390, through Mr. Justice Matthews, said:

"The principle is that whenever property has been seized by an officer of the court, by virtue of its process, the property is to be considered as in the custody of the court, and under its control for the time being, and that no other court has a right to interfere with that possession, unless it be some

court which may .have a direct supervisory control over the court whose ·process has first taken possession, or some superior jurisdiction in the premises."

In Moran v. Sturges, 154 U. S. 274, 14 Sup. Ct. 1019, 38 L. Ed. 981 —a case in which the general question was elaborately discussed—the Supreme Court, speaking through Chief Justice Fuller, said:

"It is a rule of general application that, where property is in the actual possession of one court of competent jurisdiction, such possession cannot be disturbed by process of another court."

The court, in its opinion, also referred to the case of Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008, 37 L. Ed. 815, as strongly supporting the same doctrine. It may be remarked that this doctrine is also sustained by the case of Hazelrigg v. Bronaugh, 78 Ky. 62.

In Heidritter v. Elizabeth Oilcloth Co., 112 U. S. 294, 5 Sup. Ct. 135, 28 L. Ed. 729, it was held that where proceedings in rem are commenced in a state court, and analogous proceedings in rem in a court of the United States against the same property, exclusive jurisdiction for the purposes of its own suit is acquired by that court which first takes possession of the res.

In the case of Opdyke & Calhoun v. St. Louis & Southeastern Ry. Co., brought in this court in 1874, the precise question involved in this case was discussed perhaps as elaborately and fully as in any case of the kind in which the question ever arose. One Horner had obtained in the state court at Henderson, Ky., a judgment against the railroad company for damages for personal injuries. An execution thereon having been returned nulla bona, Horner instituted an action in equity in the state court, under section 474 of Myers' Code, to subject the assets of the railroad company to its payment. In his petition in that case he expressly prayed for the appointment of a receiver. Certain trustees under mortgages also intervened in that suit, and asked the same relief. Notice was given that on October 19, 1874, a motion for the appointment of a receiver in the action would be made; but the judge of the court, being detained by an obstruction to steamboat navigation, could not reach Henderson on that day, and the respective counsel agreed upon a future day for hearing the motion. With full knowledge of these facts, Opdyke & Calhoun, the trustees under another mortgage, on the next day, namely, on October 20, 1874, filed their bill in this court, alleging default in the payment of certain interest coupons, the insolvency of the railroad company, and the inadequacy of its property to pay the mortgage debt, and themselves prayed also for the appointment of a receiver. The railroad company entered its appearance on that date, and filed its answer, and with its consent a receiver was at once appointed by this court. Thereafter a receiver appointed by the state court made an application to this court similar to the one now being heard. The case was most elaborately argued before Judge Emmons and Judge Ballard, on one side by such counsel as the present Justice John M. Harlan, Ashbel Green, W. S. Opdyke, and others, and on the other side by such able lawyers as Harvey Yeaman, S. B. Vance, Gov. Thos. E. Bramlette, and others. After the most mature consideration the application of the state court's receiver was denied upon the ground that, though the action in the state court was first instituted, this court had in fact first appointed a receiver, and had thereby first acquired

possession of the property to be administered. Having been myself of counsel in that case, and most actively engaged in the litigation, I am able to state the facts with perfect accuracy, although in those days written opinions were not so frequently filed as they are now, and none was filed in disposing of that question.

In Griffiths v. Mt. Sterling Coal Road Co.—a case almost identical with the one just mentioned, and wherein the receiver of the state court attempted to seize property in the hands of the previously appointed receiver of this court—my learned predecessor, Judge Barr, made a similar ruling upon similar grounds.

In Powers v. Bluegrass B. & L. Ass'n (C. C.) 86 Fed. 705, Judge Lurton, sitting in this court, passed upon a case which cannot be distinguished in principle from the one now before us. There it was shown that a suit touching the same subject-matter was already pending in a state court, but it appeared that the property of the corporation had not been taken into judicial custody. In his opinion the learned judge, after remarking, as I do also in this case, that it could be no disrespect to the state court if this court simply maintained its own jurisdiction, and no more, said (page 707):

"The principle that, where property is in the actual possession of one court of competent jurisdiction, such possession cannot be interfered with by the process of another court, is well settled."

He therefore reached the conclusion that there was nothing in the fact of the previous pendency of the suit in a state court, unaccompanied by a seizure of property, which should prevent the appointment of a receiver, and one was accordingly appointed. A general assignment had there been made by the directors of a perfectly solvent corporation without the authority of the stockholders, and while it was thought entirely possible that this act was voidable, at least, because it was not authorized by the stockholders, nor provided for by the Kentucky law, still it was supposed that it could be ratified by the stockholders. And so it may be remarked that while section 561, Ky. St., may not expressly authorize the appointment of an agent called a "liquidator," still, to use the language of Judge Lurton, the stockholders might adopt it "as a mode of liquidation within the general powers of the corporation."

Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906, 37 L. Ed. 867, is instructive upon the question, and so also are the cases of Buck v. Colbath, 3 Wall. 334, 18 L. Ed. 257, Watson v. Jones, 13 Wall. 674, 20 L. Ed. 666, and The Lottawanna, 20 Wall. 223, 22 L. Ed. 259.

The question we are considering has usually been discussed in cases where the right to control or administer property was involved, and the principle to be deduced from the decisions seems manifestly to be this: Wherever suits are pending in two or more courts of concurrent powers, in each of which, at the instance of different plaintiffs, it is sought to control or to subject to the demands of creditors the same property, that court alone has the right to do so which first gets the property within its grasp by some recognized mode of judicial seizure, and that, too, without regard to the question of which suit was first instituted. The mere priority of commencement of litigation is not, but the priority of judicial seizure is, the test of ju-

risdiction over the res in all cases where property is the subject of contention. This test is simple, direct, and practical, and draws a line which is palpable. It is of easy solution, and cannot be open to serious mistake. Being established as the true test, it obviates the need of any resort to mere theories, and leaves the court which in fact, and presumably always properly, brought the property itself in gremio legis, to administer or control it to the exclusion of all other courts, and without leaving open the possibility of unseemly wranglings with any person who may have been disappointed in his later efforts. Some test must be recognized by all, and the palpable and practical one of first judicial seizure is not only convenient but wise.

It has never been doubted that a second suit brought by the same plaintiff against the same defendant on the same cause of action in courts of the same sovereignty would be defeated by a plea in abatement, but this is not, unless in a very remote sense, upon the ground that the court in which the first suit was brought acquired jurisdiction to the exclusion of all others, but is primarily upon the ground that a defendant should not be vexed by two such suits at the same time. Where the two suits, however, are in courts of different sovereignties, the rule does not apply, according to the doctrine of the courts of the United States (Gordon v. Gilfoil, 99 U. S. 169, 25 L. Ed. 383), though the Kentucky courts seem to follow a different rule (Wilson v. Milliken, 103 Ky. 165, 44 S. W. 660). But the general rule is everywhere limited to suits between the same parties upon the same cause of action. It neither has nor can have any reference to suits by different plaintiffs against different defendants upon different causes of action, although the suits may be nearly related, and may ultimately seek to subject the same res. Where different individuals, acting upon the right plainly possessed by each to choose a forum, go into different courts to enforce different rights against the same property, we have a case which calls into play and operation the principles upon which the pending motion must be determined. It is in such cases that what is called a "conflict of jurisdiction" arises, and in which the doctrine of judicial comity must have sway. That comity, being based upon common sense, should not be manifested in mere courteous surrenders of what somebody else asks, but should, as the word implies, be a recognition of the just rights of another court, as those rights may be ascertained upon established principles. It does not ordinarily depend upon the question of which suit was first brought, nor upon priority of service of process, for these matters may, from the nature of the litigation, affect only the question of jurisdiction over the person, and which, per se, cannot concern litigants in other causes in other courts. Where different plaintiffs lawfully choose different forums to enforce different rights, the question of priority of service of process so as to give jurisdiction of the person of the defendant would be abstract and immaterial as to the suits of third parties, unless property was seized; but, if the same property is seized by the process of both courts, then, as only one of them can control it, some test must be found for ascertaining which of them shall do so, and it is believed that no case of this sort can be found in the courts of

the United States, at least, in which any test was acted upon except that of prior judicial seizure. Where the question, therefore, is one of jurisdiction over the res, and not merely over the person, its solution must logically and necessarily depend upon the priority of custody of the res which both courts are asked to control. If we have been right in supposing that jurisdiction over the res can only be acquired by some form of judicial seizure—some form of procedure by which it is actually brought within the grasp and custody of the court—then the inquiry admits of no difficulty.

I by no means intend to say that the rule as to the first acquirement of jurisdiction over the res depends in all cases upon an actual seizure, as in admiralty or under the internal revenue or customs laws, or by replevin, or under an execution or attachment, or through a receivership. The judicial custody of property to which I refer may sometimes be acquired in a somewhat less positive way. For example, it may, in some cases and as to certain parties, be accomplished by a lis pendens (Miller v. Sherry, 2 Wall. 235, 17 L. Ed. 827), or, as against parties to the suit, there may be an equitable levy by virtue of the suit itself, where equitable assets are sought to be subjected by means of a creditors' bill (Commissioners v. Earle, 110 U. S. 710, 4 Sup. Ct. 226, 28 L. Ed. 301), though in all such cases there must be a suit upon a judgment, and a return of nulla bona, or there may be cases where the property is in the custody of the probate court by reason of its having been committed to the hands of an administrator, executor, or curator. Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906, 37 L. Ed. 867. But while in these cases the property is only potentially—that is, constructively—in custodia legis, it is nevertheless so under a certain form of judicial stress, and by virtue of a judicial proceeding, the nature of which must be appropriate to that result.

Upon a most attentive consideration of the whole case, I have reached these conclusions: First, that the proceedings in the suit in the state court, when given their just effect, had not in any way when this court's receiver was appointed, brought into the custody of that court any property of the Evening Post Company, nor could they be regarded as having, in fact, done so, even if their scope were measured by the prayer of the plaintiff's petition, rather than its averments; second, that it was therefore open to this court to appoint a receiver, and thereby judicially seize the property of the company at the instance of a judgment creditor; and, third, that, having thus first acquired jurisdiction over the property thus seized, the established principles of law and the plain rights of the judgment creditor demand that this court shall maintain its jurisdiction over it under these circumstances as certainly as it would have abandoned it if the first seizure had been by the state court.

It results that the motion of the intervening petitioner must be overruled and denied, and the intervening petition dismissed. Judgment may be prepared accordingly. Having reached this conclusion, I have not deemed it important to consider the exceptions to the intervening petition filed by the complainant, and they are pro forma overruled.