KANSAS CITY GAS CO. v. KANSAS CITY et al.

(District Court, W. D. Missouri, W. D. March 2, 1912.)

No. 3,793.

**1. COURTS (§ 282*)—JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION—LAW "IMPAIRING OBLIGATION OF CONTRACT."**

A municipal ordinance which violates the terms of a valid contract made between the city and a gas company and imposes penalties for failure to comply with its requirements is a legislative act which "impairs the obligation of the contract," within the prohibition of the federal Constitution, and entitles the gas company to relief by injunction in a federal court of equity.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824; Dec. Dig. § 282.*

For other definitions, see Words and Phrases, vol. 4, pp. 3412–3417.]

**2. COURTS (§ 282*)—JURISDICTION—PREVENTING A MULTIPLICITY OF SUITS.**

A federal court of equity has jurisdiction of a suit to enjoin the enforcement, through repeated criminal prosecutions for its violation, of a municipal ordinance which is void as in violation of the federal Constitution, on the ground of preventing vexatious litigation and a multiplicity of suits.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 820–824; Dec. Dig. § 282.*]

**3. CONSTITUTIONAL LAW (§ 81*)—"POLICE POWER"—LIMITATIONS.**

The police powers of a state or municipality do not extend to the passage of laws or ordinances which violate fundamental rights secured by the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 148; Dec. Dig. § 81.*

For other definitions, see Words and Phrases, vol. 6, pp. 5424–5438; vol. 8, p. 7756.]

**4. INJUNCTION (§ 85*)—ORDINANCES—VALIDITY—POLICE REGULATIONS.**

Enforcement of a municipal ordinance purporting to be an exercise of the police power will be enjoined where it is oppressive, unequal, unjust, or altogether unreasonable, where obedience would require an expenditure which would render its operation confiscatory, or it impairs the obligation of a contract under the mere guise or pretext of contributing to the public safety, health, and welfare which it is not adapted or intended to secure, and the courts will go behind its letter for the purpose of determining its real substance and effect.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 155, 156; Dec. Dig. § 85.*]

**5. CONSTITUTIONAL LAW (§ 129*)—IMPAIRMENT OF CONTRACTS—FRANCHISE OF GAS COMPANY.**

Complainant was granted a franchise to supply and distribute natural gas in Kansas City for a term of 30 years, to be obtained from a supply company having wells and pipe lines, under a contract approved by the

city which bound the supply company "only to furnish such supply, for such period of time" as its wells and pipe lines and such other resources as it should be able to command were capable of supplying. The franchise ordinance reserved to the city the right of inspection and regulation, but provided that the pressure required from complainant "must not only be reasonable but practicable." It further provided that should the supply of natural gas obtainable by complainant, "reasonably accessible," be inadequate, or should the city council so find, complainant should no longer be required to supply it, and also for termination of the franchise if complainant should fail or neglect to comply with its terms for 60 days after notice. After a few years the supply of gas began to fail, and during the coldest weather complainant was unable to maintain full pressure. Experts employed by the city to investigate the gas fields reported that the available supply would be exhausted in two or three years and could not be increased without unreasonable and unjustified expenditure. In this situation, at the beginning of winter the city council passed an ordinance requiring complainant to maintain a prescribed pressure at all times under penalty of prosecution and fines for each day it failed to do so. It was shown without contradiction that the supply company furnished all the gas it could and that it was impossible for complainant to maintain the required pressure in very cold weather, and that it did maintain it at other times. On its failure, prosecutions were instituted. *Held*, that such ordinance was unreasonable and void as impairing the obligation of the contract, which itself provided adequate remedies to meet the situation, and that its enforcement would be enjoined.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 296, 301, 362–413; Dec. Dig. § 129.*]

**6.** Courts (§ 508*)—Jurisdiction of Federal Courts—Injunction to Stay Proceedings in State Court.

Rev. St. § 720 (U. S. Comp. St. 1901, p. 581), prohibiting the granting of injunctions by the federal courts to stay proceedings in a court of a state, applies only to proceedings which are pending in a state court when resort is had to the federal court, and whether an action is then pending in the state court must be determined by the law of the state.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1418–1430; Dec. Dig. § 508.*

Enjoining proceedings in state courts, see notes to Garner v. Second Nat. Bank, 16 C. C. A. 90; Norton v. San Jose Fruit-Packing Co., 27 C. C. A. 575; Copeland v. Bruning, 63 C. C. A. 437.]

**7.** Courts (§ 508*)—Federal and State Courts—Conflict of Jurisdiction —Pendency and Scope of Prior Proceeding—Injunction.

The pendency in a federal court of a suit by a gas company against a city to have an ordinance requiring complainant to maintain a certain pressure in its mains under penalty of prosecutions and fines declared unreasonable and unconstitutional and void as impairing the contract made by its franchise, and the enforcement of such ordinance enjoined, is not a bar to a subsequent suit by the city against the gas company in a state court for an accounting under the franchise ordinance on the ground that the contract rates charged were excessive because of the insufficient pressure maintained, and to enjoin its further collection of such rates, and there is no ground on which the federal court may enjoin such second suit, which does not interfere with the full exercise of its own jurisdiction in the cause pending before it.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1418–1430; Dec. Dig. § 508.*

Conflict of jurisdiction of federal courts with state courts, see note to Louisville Fruit Co. v. City of Cincinnati, 22 C. C. A. 356.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by the Kansas City Gas Company against the City of Kansas City, Mo., Darius A. Brown, Mayor, John G. Park, City Counselor, Jay Lee, Assistant City Counselor, Jacob Harzfeld, F. E. Parker, and C. A. Sumner, Public Utility Commissioners of said Kansas City, and Clyde Taylor, counsel and attorney for said commissioners. On demurrer to bill and motion for preliminary injunction. Demurrer overruled, and motion granted in part.

By ordinance passed September 27, 1906, and approved September 27, 1906, the city of Kansas City authorized Hugh J. McGowan, Charles E. Small, and Randal Morgan, the survivors or survivor of them, and their or his assigns, to lay, acquire, and maintain pipes in Kansas City, for the purpose of supplying natural gas to said city and its inhabitants. This ordinance was duly accepted in writing, as therein required, and thereupon became a contract between the city and said grantees. This contract was for a full period of 30 years, and provided that the grantees might convey all their rights and privileges therein granted to a corporation, its successors or assigns, to be organized by them under the laws of the state of Missouri for the purpose of acquiring, building, constructing, and operating a gas plant authorized under that ordinance. The complainant is such corporation, and has succeeded to all the rights conferred upon the original grantees.

The ordinance, by section 5 thereof, further provided that "said grantees shall at all times keep and maintain such pressure of gas in all places where the same may be furnished to Kansas City and its inhabitants as may be required by ordinance; provided the pressure so required shall be reasonable and practicable." This provision was contained in two prior ordinances known as "model ordinances," passed by the common council of Kansas City, and duly approved, which were intended to operate as a guide in the preparation of any ordinance-contract thereafter to be entered into authorizing the actual supplying of natural gas to the city.

Section 10 provided that: "For the purpose of enforcing the provisions of this ordinance and securing the correct measurement of gas furnished under the same and the proper pressure of said gas to produce the best obtainable results with least consumption of gas, with due regard to the reasonableness and practicability of such pressure, and to prevent the waste thereof and to protect the city in its corporate rights, and to protect the consumers in their rights, the city shall have the right to provide, by ordinance, for the appointment of one or more inspectors or measurers of gas, and to prescribe their duties by ordinance, and to pass such ordinances as may be necessary to enforce the provisions of this ordinance."

Section 13 provided that: "The said grantees shall be entitled to charge and collect from consumers of such gas, during the period of five years from and after natural gas is first furnished hereunder at the rate of not to exceed twenty-five cents per thousand cubic feet, and during the period of five years next thereafter at the rate of not to exceed twenty-seven cents per thousand cubic feet, and thereafter during the period of the aforesaid grant at the rate of not exceeding thirty cents per thousand cubic feet." And further that: "Under the permission and authority hereby granted, the grantees shall furnish natural gas for illuminating, heating and mechanical purposes, which shall at all times be of the same character and quality as when it comes from the earth; and it shall not be mixed with air or otherwise adulterated."

Section 14 provided that: "Should the supply of natural gas, obtainable by grantees reasonably accessible, be, at any time hereafter during the life of this ordinance, inadequate to warrant them in continuing to supply natural gas under the terms of this ordinance, or should the common council of Kansas City so find at any time (and in the event of a disagreement as to the facts in this respect either party or a gas consumer may have recourse to the courts to establish the facts), they shall not be longer required to do so, but shall manufacture and furnish manufactured gas to said city and its inhabitants through said mains and pipes under the provisions of

this ordinance as far as applicable and subject to all the terms and provisions contained in the ordinance number 6,658 granted to Milton J. Payne and others, passed August 24, 1895, and the ordinance number 6,125 granted to Robert M. Snyder and others, passed January 10, 1895, and ordinance number 8,033, entitled: 'An ordinance granting the consent of Kansas City to the consolidation of the Missouri Gas Company and the Kansas City Gas Company,' until the expiration of said ordinance and no longer, except as to price which shall be settled by arbitration (as thereafter provided). The grantees shall not discontinue furnishing natural gas without serving at least six (6) months' written notice upon the mayor of Kansas City of their intention so to do."

Section 17 provided that: "If the said grantees shall do or cause to be done any act or thing by this ordinance prohibited, or shall fail, refuse or neglect to do any act by this ordinance required, they shall forfeit all rights and privileges granted by this ordinance, and this franchise and all rights thereunder granted shall ipso facto cease, terminate and become null and void, provided such failure to comply with the conditions of this ordinance shall continue unrectified for sixty (60) days after written notice thereof from the board of public works of said city, or the common council of said city."

By section 20 it was provided that the grantees might acquire the ownership or use or control, by purchase, lease, agreement, or otherwise, of the pipes and property of the Kansas City Missouri Gas Company aforesaid, subject to the right of the city to purchase the same under the special provisions of the several ordinances under which said company was then operating, as set out above. Such pipes and property were subsequently acquired under this provision. By said section 20 it was further provided that: "Grantees covenant that their contract for gas supply is with the Kaw Gas Company and the Kansas City Pipe Line Company (corporations), that under the terms thereof, after two years from the time natural gas is first furnished to Kansas City thereunder, the division of the gross income received for said gas between the distributing company and the supply company shall be in the proportion of thirty-seven and one-half cents out of each dollar to the former, and sixty-two and one-half cents to the latter; and covenant for themselves, their successors and assigns, that none of the terms of that contract agreement shall be changed without consent of Kansas City expressed by ordinance; and grantees agree for themselves, their successors and assigns, that if Kansas City shall acquire said plant and property they will on demand transfer free of cost to Kansas City all their rights under said contract; and grantees further agree to procure from said two corporations and file with the city clerk within ninety days from the time this ordinance becomes a law, a written agreement in form to be approved by the city counselor, agreeing that they (said two corporations) will, if Kansas City shall acquire said plant as aforesaid, upon demand, furnish and continue to furnish during the remaining period of this franchise gas to Kansas City on the same term as they have agreed to furnish it to the grantees, their successors and assigns." Kansas City further agreed not to exercise its right to purchase for the period of 10 years, unless grantees shall before that time have "ceased to furnish natural gas as required by this ordinance."

The written agreement referred to, in form approved by the city counselor, was duly filed. The city counselor also approved the form of contract between the grantees and the supplying corporations. All the rights of the supplying corporations have been acquired and are now owned and controlled by the Kansas Natural Gas Company, a foreign corporation. This supply contract between the supplying companies of the first part and the grantees, now the Kansas City Gas Company, of the second part, in so far as it bears upon this controversy, provides as follows: "The party of the first part hereby agrees that it will during the period of such ordinance, or any extension or renewal thereof, or of any ordinance which may be obtained, either in the interest of the party of the second part, or of its property, supply and deliver through its said pipe line or lines, to said party of the second part, or any successor in the ownership of the property for the distribution of

gas for Kansas City, Missouri, at a pressure of twenty (20) pounds at the point of delivery above mentioned, natural gas in such amount as will at all times fully supply the demand for all purposes of consumption. as provided in this contract, for the consideration hereinafter mentioned. However, as the production of gas from the wells and the conveying of it from long distances is subject to accidents and interruptions and failures, the party of the first part does not under this contract undertake to furnish the party of the second part with an uninterrupted supply of gas for the period named herein, but only to furnish such supply for such a period of time as the wells and pipe lines of the party of the first part and such other resources as the party of the first part shall be able to command are capable of supplying. And it is expressly understood and agreed by the party of the second part that the party of the first part shall not be liable for any loss, damage or injury that may result either directly or indirectly from such shortages or interruptions, but said party of the first agrees to use diligence to supply the party of the second part with a constant and sufficient quantity of merchantable gas for all consumers. So long as the party of the first part is able to supply the same, the party of the second part agrees to buy from the party of the first part all the gas it may need to fully supply the demand for domestic consumption in the said city and to pay to the party of the first part for the natural gas which it shall receive from said party of the first part for all purposes during the first two years a sum equal to sixty per cent. of its gross receipts from the sale of such natural gas in said city of Kansas City, Missouri, and thereafter a sum equal to sixty-two and one-half per cent. of such gross receipts."

This was the form of contract submitted to and approved by the then city counselor of Kansas City just prior to and in view of the adoption of the franchise ordinance in question.

Section 21 of the ordinance provides that: "Nothing in this ordinance shall be construed as granting to said grantees any exclusive franchise, rights or privileges."

In section 22 it is provided that: "It being the purpose to safeguard and make sure that there may always be competition in the matter of supplying gas and that gas will be supplied within the city, the grantees and assigns agree that any action on their part impairing or limiting or preventing such competition, or any substantial and continued failure for a period of sixty days to furnish gas in compliance with the provisions of this ordinance, shall constitute a violation of this ordinance, and the city shall have the right to repeal this ordinance by ordinance, and shall have the right to purchase the plant under the same terms and provisions stated in sections 13 and 14 of ordinance of Kansas City, No. 6,658, passed August 24, 1895, commonly known as the ordinance of the Kansas City, Missouri, Gas Company, but the statement of these particular remedies shall not be construed as taking away from the city any of its rights in law or equity. * * * Kansas City retains to itself the right to itself own and operate a plant or plants for supplying the city, or the inhabitants thereof, with natural or artificial gas (if it shall at any time see fit so to do) for lighting and heating and manufacturing purposes, and to own and operate a plant or plants for supplying the city, or the inhabitants thereof, with any other sort of light."

Under this franchise ordinance the grantees and their assignee, the complainant company, have been furnishing natural gas to Kansas City, and its inhabitants, since the late fall of 1906 and the winter of 1907. The service, at first more restricted, has been continuously increased to meet the demand of increased consumption and the varying supply of the fields. At various periods the supply has proved unequal to the demand of consumption in unusually cold weather, ranging somewhere about what is usually denominated zero weather. It was originally contemplated and understood by both parties that the supply should be taken from Kansas fields as nearest and most accessible to Kansas City. Prior to and also, perhaps, contemporaneously with the passage of this ordinance, the supply company had made contracts with other towns and cities in Kansas and Missouri for the supply of natural gas; and whether from the great increase of consumption, or from

natural causes, or both, the supply of natural gas in the Kansas fields and the accompanying pressure became greatly diminished, and in some pools practically exhausted, so that it became necessary to extend the mains of the supply company to other fields, notably in the state of Oklahoma. This was attended with great expenditure and with many legal difficulties, particularly in the case of procuring transportation of gas from the state of Oklahoma, but final appeals to the Circuit Court of Appeals and the Supreme Court of the United States resulted in throwing open these fields of supply to the Kansas City consumers. With all such diligence and effort on the part of the complainant and its supply company, it was found, more particularly during the winter of 1910–11 and 1911–12, that the supply was unequal to the demand during periods of unusually low temperature as stated. This led to negotiations between the city authorities and the gas company with a view to bettering conditions and providing for future supplies.

On or about October 24, 1911, the city gas inspector's department, by direction of the mayor, issued a booklet of information to the consumers of natural gas setting before them the conditions existing, together with certain recommendations of the Public Utilities Commission. This booklet, among other things, contained the following:

"Last year after such investigation as could be made, without the employment of gas experts to visit the fields, the Commission recommended to the gas company that storage tanks should be erected in the city, of sufficient capacity to enable the company to carry the demand over the 'peak' load, by supplementing the quantity coming direct from the field by the amount stored therein. In response to this recommendation, the company is erecting a tank of 5,000,000 cubic feet capacity for this purpose.

"While this will not solve the difficulties, still the danger of suffering from lack of gas will not be as great this winter.

"Upon instructions from Mayor Darius A. Brown, the city gas inspector and the gas company officials were instructed to equalize the gas pressure at the different distributing stations within the city, so that all parts of the city would get approximately the same service.

"The results from this suggestion were immediately beneficial.

"It is the belief of the Commission that except in seasons of prolonged cold weather or in case of an unavoidable breakdown at the pumping stations the service of the gas company will be fairly satisfactory. In either of the above contingencies the facilities of the service will not be adequate. If the report of Prof. Haworth shows gas in sufficient quantity in the field to warrant the expenditures, the Commission will insist that an additional pipe line be laid during the coming summer, which will be ample to take care of the demand in Kansas City for some time.

"The accompanying suggestions of the gas inspector, Mr. Robt. W. Goodnow, are commended to the people of Kansas City as being well worth their attention.

"We advise that if you use the gas for fuel that you have some coal or wood on hand to fall back upon, should there be some interruption in the service.

"Last winter the service was better than in the past; at the same time some interruptions did occur, that seemed almost unavoidable."

November 21, 1911, the examining expert, Prof. Haworth of the University of Kansas, and state geologist of that state, made his report upon the condition of the gas fields of Kansas and Oklahoma, and shortly thereafter another expert employed by the city, Mr. B. F. Walker, professor of mechanical engineering in the University of Kansas, made report upon the pipe lines, works, and facilities for supply and distribution of the complainant company and its supply company. The former reported that under present conditions two more winters, or three at most, is as long as we may expect natural gas to be delivered to Kansas City in sufficient quantity to equal present domestic consumption unless new developments of gas far exceed present indications; that the pipe lines and pumping stations of the company are about as much as the known gas supply would warrant the company in installing, or as there is any need of installing. Prof. Walker found that so far as the

supply is concerned the present equipment is sufficient to meet the needs of the territory served during all excepting a very few weeks of the year; that to increase the capacity of the system will only use up the available gas in a shorter time; that, unless the supply of gas is largely augmented by the discovery of new fields, it is impracticable to attempt to increase the supply of gas consumers, except by cutting down its use in commercial plants. He says: "Speaking now of the feasibility of the extensive additions to equipment mentioned above on the condition of more gas being available at lowered pressure, with the purpose of increasing the capacity of the system, we have to bear in mind the report of Prof. Haworth to the effect that, unless fields now unknown are discovered, the supply of gas will be exhausted in two or three years at the present rate of consumption. To make the additions mentioned would require fully half of that time, if not more, with an expenditure running into millions of dollars. No sane man would invest his money in such a project."

The substance of the reports of the two experts taken in connection with the other testimony was that the gas supply is rapidly diminishing so that its life is but two or three years at the most, or perhaps from five to seven, provided commercial users be cut off. In a subsequent report to the city council Prof. Haworth said he thought his estimate was too sanguine and should be somewhat reduced. The supply cannot be increased other than by the opening of new fields, and no new fields are in sight, and there is every reason to believe that they do not exist to any remedial extent. The present equipment is reasonably sufficient to handle the present supply, and the equipment of the complainant company is sufficient to supply the wants of the city when gas is supplied to its mains at contract pressure, which means in sufficient quantity, because the pressure depends almost entirely upon the quantity of gas; that to supply additional gas to the complainant company would require the investment of millions of dollars, and a long period of time for installation; that the quantity of gas to be procured would not justify any sane man in making such investment in view of the results obtainable. In other words, that it would be entirely unreasonable. These reports were accepted by the city, by the gas company, and by the public generally, as reliable and accurate. The instrumentalities of the complainant company are so constructed that when the volume of gas is insufficient the pipes and mains are opened automatically, and all gas obtainable is admitted and distributed; so that the complainant constantly distributed all the gas it could obtain from its supply company. There is no other supply of natural gas obtainable by complainant whether reasonably accessible or otherwise, and in the absence of sufficient volume it has no means appreciably to augment its pressure. Consequently, at no time during the period covered by this controversy has the complainant, in point of fact, been able by the exercise of diligence or by expenditures, reasonable or otherwise, appreciably to increase the volume of gas or the pressure at which it has been delivered. Even the contemplated holder, with a capacity of 5,000,000 cubic feet, if it could have been filled, would not have been able to increase the pressure to five inches during periods of extreme cold. It is further shown that all practicable storage is affected by packing the gas in the pipes. Holders are not needed when there is gas to fill them, and there is no gas to fill them when they could be used to advantage. Under the provisions of the contract ordinance that the city might, by ordinance, prescribe a pressure that was reasonable and practicable, the common council on January 12, 1909, passed an ordinance that the pressure should not be less than 5 inches water pressure for a period of 24 consecutive hours, nor exceed 13 inches of water pressure for a like period. On the 23d day of May, 1910, this ordinance was amended by striking out the words "for a period of twenty-four consecutive hours"; thereby providing for a constant pressure of not less than 5 nor more than 13 inches. No penalties were provided, and it is in evidence that this was done at the insistence of the gas company that no penalty could be imposed for failure to furnish a pressure of gas that was impossible. This was the condition during the remainder of 1910 and during the year 1911, until some time after the report of the experts in November.

In view of, and with full knowledge of, the conditions then existing, the common council on the 14th day of December, 1911, passed an ordinance, approved December 15, 1911, amending the ordinance of May 23, 1910, aforesaid, by adding a new section which provided that: "Any person, firm or corporation supplying natural gas to this city, or its inhabitants, who shall violate any of the provisions of section 1 hereof, shall be deemed guilty of a violation hereof, and shall, upon conviction thereof, be fined in a sum of not less than one hundred dollars, or not more than five hundred dollars, for every such violation, and for each and every day during the whole or part of which any such person, firm, company or corporation shall fail to comply with the terms hereof, he, it, or they shall be deemed guilty of a separate violation hereof."

Section 1, as has been stated, provided that the complainant should "so control its source of supply and adjust its mains for the distribution of natural gas that the minimum pressure of said gas at every point in this city, where natural gas is supplied for consumption, shall not be less than five inches water pressure." Unusually cold weather prevailed in Kansas City during December and January. The city sought, whether effectively or not, to institute two prosecutions under this amended ordinance, and threatened to bring many others. Upon this state of facts the complainant exhibited its bill to this court seeking relief on the ground that the ordinance was unreasonable, impracticable, and impossible to be obeyed by the complainant; that it impaired the obligations of its contract with the city, took its property without due process of law, and was therefore void. A temporary restraining order was issued. The defendants appeared and contended in opposition: First, that the ordinance was a valid exercise of the police power of the city, and was intended to protect the health and general welfare of the community; second, that, the ordinances being valid police regulations, property rights must yield to them; third, that the difficulty of procuring gas does not render the ordinances unconstitutional; fourth, that complainant has an adequate remedy at law, it can present its defenses in the state court or sue for damages, and an injunction will not lie; fifth, that the ordinances do not violate the Constitution. Meantime, before the hearing in this court, the city, on behalf of itself and all gas consumers, filed in the state court its bill in equity declaring that the gas furnished by complainant by reason of inadequacy and insufficiency of pressure was not of the value of the contract price and praying an accounting. The complainant thereupon contended in this court that this action on the part of the city was in disobedience of the restraining order heretofore issued by this court, and that this court had full jurisdiction of the entire subject-matter involving the pressure in controversy.

The hearing upon the temporary injunction was held on the 26th, 27th, and 29th days of January, 1912. The complainant on its part filed numerous affidavits to sustain the contentions, substantially as heretofore recited. The defendants filed many affidavits, none of which sought appreciably to controvert such contentions respecting supply and impossibility of performance. Their affidavits establish that on certain days of unusually low temperature, during the period complained of, the pressure did not reach the minimum prescribed by ordinance. These facts are undisputed. Other affidavits sought to establish the necessity of a five-inch pressure for the uniform and proper distribution of natural gas throughout the distributing system for gas as it now exists in Kansas City; that gas furnished at a less pressure than five inches is worth less than that furnished at five inches or over; that practically all the apparatus that is used by all persons resorting to the use of natural gas for heating and lighting in Kansas City is so designed as to operate more satisfactorily and safely at a pressure above the five-inch water pressure; that there is danger from asphyxiation and fires when the pressure fluctuates from a point considerably below five inches to one above and increasing to thirteen inches; that fires have thus resulted, and death by asphyxiation has been narrowly averted; that from five to seven inches is recognized as the reasonable and most effective pressure for the practical use of natural gas. On February 3, 1912, several days after the arguments,

defendants, by consent, filed their joint and several demurrer to the bill upon the grounds: First, that said bill does not state any matter of equity entitling plaintiff to the relief prayed for; second, the facts stated are not sufficient to entitle plaintiff to any relief against these defendants; third, the facts stated show that complainant has an adequate remedy at law; fourth, the facts stated show that this is not a controversy arising under the Constitution or laws of the United States.

Charles E. Small and Edward L. Scarritt, for complainant.

John G. Park, City Counselor, and Clyde Taylor, Attorney for Commissioners, for defendants.

VAN VALKENBURGH, District Judge (after stating the facts as above). [1] I. Complainant asserts that the amended ordinance of December 15, 1911, is unjust, unreasonable, oppressive, and void, in that it impairs the obligations of its ordinance-contract with the city and takes its property without due process of law. Complainant invokes section 10, article 1, of the Constitution of the United States and the fourteenth amendment thereof. The defendants contend that no constitutional question is involved, and, there being no diversity of citizenship, that this court is without jurisdiction.

As has been frequently said, it is always a matter of great delicacy when federal courts are called upon to interfere with the local laws of the state, and I cannot more adequately describe the attitude of this court than by quoting from the opinion of Chief Justice Marshall in the case of Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257. He says:

"It is most true that this court will not take jurisdiction if it should not, but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the Legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously perform our duty."

The ordinance of September 27, 1906, authorizing complainant's assignors to lay, acquire, and maintain pipes in Kansas City for the purpose of supplying natural gas to said city and its inhabitants, being legally adopted, accompanied by all legal requirements, and properly accepted, constitutes a contract between compainant and the city. Vicksburg v. Waterworks Co., 202 U. S. 453–462, 26 Sup. Ct. 660, 50 L. Ed. 1102, 6 Ann. Cas. 253; Aurora Water Co. v. City of Aurora, 129 Mo. 540, 31 S. W. 946; State ex rel. Abel v. Gates, 190 Mo. 540–558, 89 S. W. 881, 2 L. R. A. (N. S.) 152; Monett E. L., P. & I. Co. v. City of Monett (C. C.) 186 Fed. 360–364. And a municipal ordinance which impairs the obligations of such a contract, or takes property without due process of law, comes within the prohibitions of the federal Constitution, and in such cases the federal courts may be appealed to for redress.

The Supreme Court, in Willcox v. Consolidated Gas Co., 212 U. S.

19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034, in discussing such a situation, says:

"It is not a question of discretion or comity for the federal court to take jurisdiction of a case; it is the duty of that court to take jurisdiction when properly appealed to; and it should not be criticised for so doing even though the case be one of local interest. The right of a party plaintiff to choose the federal court cannot be properly denied."

The practical reason for this, apart from the plain provisions of the law, is clearly and forcibly stated in the opinion of that court in Prentis v. Atlantic Coast Line, 211 U. S. 210–228, 29 Sup. Ct. 67, 70 (53 L. Ed. 150):

"It seems to us clear that the appellees were not bound to wait for proceedings brought to enforce the rate and to punish them for departing from it. Those, we have assumed in favor of the appellants would be proceedings in court and could not be enjoined; while to confine the railroads to them for the assertion of their rights would be to deprive them of a part of those rights. If the railroads were required to take no active steps until they could bring a writ of error from this court to the Supreme Court of Appeals after a final judgment, they would come here with the facts already found against them. But the determination as to their rights turns almost wholly upon the facts to be found. Whether their property was taken unconstitutionally depends upon the valuation of the property, the income to be derived from the proposed rate, and the proportion between the two—pure matters of fact. When those are settled, the law is tolerably plain. All their constitutional rights, we repeat, depend upon what the facts are found to be. They are not to be forbidden to try those facts before a court of their own choosing if otherwise competent."

Applications to the courts of United States for relief under circumstances such as are here alleged to exist have been commonly made and uniformly entertained. Atchison, T. & S. F. R. R. Co. v. City of Shawnee (C. C. A. Eighth Circuit), 183 Fed. 85, 105 C. C. A. 377; Northern Pac. Ry. Co. v. Minnesota, 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630; San Francisco G. & E. Co. v. City, etc., of San Francisco (C. C.) 189 Fed. 943–948; Shawnee Milling Co. v. Temple (C. C.) 179 Fed. 517; City of Owensboro v. Cumberland T. & T. Co. (C. C. A. Sixth Circuit) 174 Fed. 739, 99 C. C. A. 1; Spring Valley Water Co. v. City & County of San Francisco et al. (C. C.) 165 Fed. 667; Dobbins v. City of Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169.

In Atchison, Topeka & Santa Fé Railroad Co. v. City of Shawnee, the court said:

"A resolution of a city council, ordering a railroad company to open and put in condition for public travel a street through its station yards, previously vacated by an ordinance which constituted a contract with the company, where disobedience of such order subjected the railroad company to a penalty under the laws of the state, is a legislative act, which impairs the obligation of the contract and entitles the company to relief by injunction in a federal court of equity."

In Northern Pacific Railway Co. v. Minnesota, 208 U. S. 583, 28 Sup. Ct. 341, 52 L. Ed. 630, the Supreme Court said:

"Municipal legislation passed under supposed legislative authority from the state is within the prohibition of the federal Constitution and void if it impairs the obligation of a contract.

"In cases arising under the contract clause of the federal Constitution, this court determines for itself whether there is a contract valid and binding between the parties, and whether its obligation has been impaired by the legislative action of the state.

"Legislation which deprives one of the benefit of a contract or adds new duties or obligations thereto necessarily impairs the obligation of the contract."

And this was said to be true when the municipal legislation has the effect to impair contract rights by depriving the parties of their benefit, and makes requirements which the contract did not theretofore impose upon them.

"The terms 'life, liberty, and property' embrace every right which the law protects; they include not only the right to own and hold, but also the right to use and enjoy property. Profits and income are property. The right of contract, the right to fix the terms and conditions upon which the owner will sell, lease, or otherwise dispose of his property, is itself property, and any statute or ordinance which limits or curtails these rights deprives the party affected of his property." Spring Valley Water Co. v. City and County of San Francisco (C. C.) 165 Fed. 667.

Citations in support of this proposition might be indefinitely multiplied.

[2] II. Counsel for defendants next urge that a federal court of equity is without jurisdiction, for the reason that this is a criminal proceeding, and that complainant has an adequate remedy at law by interposing its defense in the courts of the state. We may freely concede the general proposition that equity will not ordinarily interfere to stay prosecutions, where an adequate remedy at law is provided. That remedy, however, must be as full, adequate, and complete in every particular as that which a court of equity would give, and, when it is not so, the latter court will assert its jurisdiction, and, in proper cases, restrain unwarranted and vexatious prosecutions. City of Rushville et al. v. Rushville Nat. Gas Co., 132 Ind. 575, 28 N. E. 853, 15 L. R. A. 321; Atchison, Topeka & S. F. R. Co. v. City of Shawnee (C. C. A. Eighth Circuit) 183 Fed. 85, 105 C. C. A. 377; City of Hutchinson v. Beckham (C. C. A. Eighth Circuit) 118 Fed. 399, 55 C. C. A. 333; Jewel Tea Co. v. Lee's Summit, Mo., et al. (C. C.) 189 Fed. 280; San Joaquin & Kings River Canal & Irrigation Co. v. Stanislaus County et al. (C. C.) 163 Fed. 567; Shawnee Milling Co. v. Temple (C. C.) 179 Fed. 517; Nelson v. City of Murfreesboro (C. C.) 179 Fed. 905–908; Sylvester Coal Co. et al. v. City of St. Louis et al., 130 Mo. 323, 32 S. W. 649, 51 Am. St. Rep. 566; Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; Dillon on Municipal Corporations (5th Ed.) pars. 1269, 1270.

The grounds upon which this jurisdiction is exercised may be most pointedly disclosed by a brief reference to the decided cases.

"A court of equity may enjoin the enforcement of a city ordinance to prevent a multiplicity of actions; the ordinance being void as to the appellee in a most material provision which absolutely denied to it substantial rights except on condition that it submit to unjust restrictions." City of Rushville et al. v. Rushville Nat. Gas Co., 132 Ind. 575, 28 N. E. 853, 15 L. R. A. 321.

The language of the Court of Appeals for this circuit in Atchison, Topeka & Santa Fé R. Co. v. City of Shawnee, has been already quoted under the preceding section.

"The enforcement of a municipal ordinance, void for interference with interstate commerce, by criminal proceedings, with frequent arrests and other arrests threatened, will be enjoined." Jewel Tea Co. v. Lee's Summit, Mo. (C. C.) 189 Fed. 280.

In San Joaquin & Kings River Canal & Irrigation Co. v. Stanislaus County et al. (C. C.) 163 Fed. 567, the equity jurisdiction was upheld on the ground of multiplicity.

"A bill for injunction to restrain the enforcement of a criminal or penal statute is allowable when the statute is unconstitutional or invalid, where, in an attempt to enforce it, property rights are invaded, or where oft-repeated attempts to enforce it would create a multiplicity of suits." Shawnee Milling Co. v. Temple (C. C.) 179 Fed. 517.

In Sylvester Coal Co. et al. v. City of St. Louis et al., 130 Mo. 323, 32 S. W. 649, 51 Am. St. Rep. 566, the Supreme Court of this state said:

"The enforcement of a city ordinance making it a misdemeanor to buy or sell certain articles, unless in the manner therein provided, will be enjoined if such ordinance is invalid although its invalidity has not been determined in a prosecution thereunder or in an action of a legal character. The prevention of vexations litigation and a multiplicity of suits constitutes a favorite ground of equity jurisdiction. Municipal ordinances, though penal, are not criminal statutes."

"It is well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity." Dobbins v. City of Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169.

"A court of equity has jurisdiction of a suit to enjoin the enforcement of an illegal city ordinance imposing a license tax, where, in addition to the illegality of the tax, it is shown that, if the city is permitted to proceed to enforce it by the remedies provided, complainant will be called upon to defend a multitude of criminal prosecutions, and will suffer irreparable injury in his business. And this is so notwithstanding the validity of the ordinance might have been tried in any one of the criminal prosecutions thus brought by the city." City of Hutchinson v. Beckham (C. C. A. Eighth Circuit) 118 Fed. 399, 55 C. C. A. 333.

This doctrine is so well recognized and is sustained by such an overwhelming weight of authority that it is deemed unnecessary to discuss it further.

[3] III. But counsel for defendants earnestly insist that this ordinance is an exercise of the police power of the city amply conferred by the state Constitution and laws, and by charter; and that such regulations do not impair constitutional guaranties. No court can or should ignore or impair the legitimate police powers reserved to the states which are essential to the maintenance of order and the preservation of the health, happiness, and general welfare of the citizen. The definition of this power contained in the citations of defendants' counsel is readily accepted and must be indorsed by every thoughtful person.

"This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect

the lives, health, morals, comfort, and general welfare of the people, and is paramount to any rights under contracts between individuals. Familiar instances of this are where parties enter into contracts, perfectly lawful at the time, to sell liquor, operate a brewery or distillery, or carry on a lottery, all of which are subject to impairment by a change of policy on the part of the state, prohibiting the establishment or continuance of such traffic; in other words, that parties by entering into contracts may not estop the Legislature from enacting laws intended for the public good." Manigault v. Springs, 199 U. S. 473–480, 26 Sup. Ct. 127, 130 (50 L. Ed. 274).

And again:

"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals. The Legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, 'Salus populi suprema lex'; and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself." Beer Co. v. Massachusetts, 97 U. S. 25–33, 24 L. Ed. 989.

And the Supreme Court of the United States, speaking through Mr. Justice Lurton in the late case of City of Chicago v. Sturges, 222 U. S. 313, 32 Sup. Ct. 92, 56 L. Ed. 215, decided December 18, 1911, and not yet reported in bound volume, has further said:

"Primarily governments exist for the maintenance of social order. Hence it is that the obligation of the government to protect life, liberty, and property against the conduct of the indifferent, the careless, and the evil-minded may be regarded as lying at the very foundation of the social compact. A recognition of this supreme obligation is found in those exertions of the legislative power which have as an end the preservation of social order and the protection of the welfare of the public and of the individual."

But the learned justice ended the paragraph just quoted as follows:

"If such legislation be reasonably adapted to the end in view, affords a hearing before judgment, and is not forbidden by some other affirmative provision of constitutional law is it not to be regarded as denying due process of law under the provisions of the fourteenth amendment."

And in Beer Co. v. Massachusetts, supra, the court limited its statement in the following language:

"Of course, we do not mean to lay down any rule at variance with what this court has decided with regard to the paramount authority of the Constitution and laws of the United States, relating to the regulation of commerce with foreign nations and among the several states, or otherwise."

And in Manigault v. Springs, supra, it was distinctly stated that "this power is subject to limitations in certain cases." These limitations are most forcibly and luminously stated in the case of Mugler v. Kansas, 123 U. S. 623–661, 8 Sup. Ct. 273, 297 (31 L. Ed. 205), a case upon which counsel for defendants most confidently rely as vouchsafing immunity to the ordinance attacked in this proceeding. The court says:

"Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are

appropriate or needful for the protection of the public morals, the public health, or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of a statute (Sinking Fund Cases, 99 U. S. 700, 718 [25 L. Ed. 496]), the courts must obey the Constitution rather than the lawmaking department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in Marbury v. Madison, 1 Cranch, 137, 176 [2 L. Ed. 60], 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may at any time be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

This utterance of the Supreme Court of the United States in a case where it upheld the police power of the state when properly exercised was adopted by the Supreme Court of this state in State v. Layton, 160 Mo. 474–489, 61 S. W. 171, 174 (62 L. R. A. 163, 83 Am. St. Rep. 487), with this added statement:

"Under forms of government where limitations upon executive and legislative powers do not exist, there is no restriction upon this necessary function of government; but under our federal and state governments limitations are to be found in our written Constitutions."

The Supreme Court of Missouri, in State v. Julow, 129 Mo., loc. cit. 174, 31 S. W. 782, 29 L. R. A. 257, 50 Am. St. Rep. 443, thus quotes with approval the following language of Judge Comstock in Wynehamer v. People, 13 N. Y. 378:

"To say, as has been suggested, that 'the law of the land,' or 'due process of law,' may mean the very act of legislation which deprives the citizen of his rights, privileges, or property, leads to a simple absurdity. The Constitution would then mean that no person shall be deprived of his property or rights, unless the Legislature shall pass a law to effectuate the wrong, and this would be throwing the restraint entirely away. * * * Where rights of property are admitted to exist, the Legislature cannot say they shall exist no longer; nor will it make any difference, although a process and a tribunal are appointed to execute the sentence. If this is the 'law of the land,' and 'due process of law,' within the meaning of the Constitution, then the Legislature is omnipotent. It may, under the same interpretation, pass a law to take away liberty or life without a pre-existing cause, appointing judicial and executive agencies to execute its will. Property is placed by the Constitution in the same category with liberty and life."

Turning again to the Supreme Court of the United States, we find the following exposition of this same limitation in the opinion of Mr. Justice Matthews in Yick Wo v. Hopkins, 118 U. S. 356–369, 6 Sup. Ct. 1064, 1071 (30 L. Ed. 220), a case which had under con-

sideration a municipal ordinance passed in derogation of the constitutional rights of Chinese residents of the city and county of San Francisco:

"When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power. It is, indeed, quite true that there must always be lodged somewhere, and in some person or body, the authority of final decision; and in many cases of mere administration the responsibility is purely political, no appeal lying except to the ultimate tribunal of the public judgment, exercised either in the pressure of opinion or by means of the suffrage. But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the commonwealth 'may be a government of laws and not of men.' For the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

Mr. Justice Miller, in Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L. Ed. 557, said:

"It would be a very curious and unsatisfactory result, if in construing a provision or constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

It may be confidently stated that in no case in which a carefully considered opinion has been written has the police power of the state been asserted without reservation of the limitations recognized in the cases cited. In adopting the federal Constitution the people of the United States in their sovereign capacity placed upon their own powers limitations which can be removed only by acts of equal dignity and solemnity. It constitutes a compact between the people, considered in whole or in part, and the individual, whether his station be high or low. It transcends government, state or national, which seeks to invade or set aside its guaranties. Those guaranties are co-ordinate, and no one of them can be so employed as to render nugatory any of

the others.   They are not so flexible or volatile that they may be lightly set aside under conceptions of necessity or desirability however beneficial or well meant the purpose may be.   A Constitution that neither guarantees stability nor places limitation upon the arbitrary exercise of governmental power is a Constitution in name only, and by the Constitution of the United States the judicial power is extended to all cases in law and equity arising under it.

[4]  IV. It must be conceded, then, that the police power of the state is subordinate to the Constitution, and that statutes and ordinances purporting to be an expression of that power will be set aside if they invade constitutional rights.   It may be conceded further that such regulations will be sustained, unless their conflict with such rights is clearly apparent.   What then are the grounds upon which the court may feel itself called upon to declare such acts invalid?   The principles governing are well established.   The difficulty, if any, to be encountered, lies in the determination of the facts.   These must be resolved by whatsoever tribunal has been charged with that duty.

In general it may be stated that the courts, in all jurisdictions, with uniformity, have declared that the enforcement of a municipal ordinance will be enjoined when it is unreasonable, whether upon its face, or where a state of facts makes it so; where it is oppressive, unequal, unjust, or altogether unreasonable; where it involves oppression or abuse of power under the mere guise or pretext of regulation; where obedience would require an expenditure which would render its operation confiscatory; where it has no reference to the comfort, safety, or welfare of society; where it is not adapted thereto nor intended to produce such beneficial result; where it subverts rights under the mere pretense and color of regulation; where it is apparent that the public health, safety, and welfare bear but the most remote relation to the law; where it impairs the obligations of contracts under the mere guise and pretext of contributing to the public safety, health, and welfare in the form and under the pretense of police regulation.   This is always so when such vices appear upon its face, and the courts when appealed to will always go behind the letter for the purpose of determining the real substance and effect.   The above statement might be indefinitely elaborated, but it is sufficient to indicate the grounds upon which such ordinances will be scrutinized when it is charged that a so-called police regulation invades the constitutional rights of the party applying to the court for protection.   For purposes of elucidation a number of illustrative decisions will be quoted from the great array of cases cited in support of the doctrine.

"The courts will not take the recital in an ordinance that its purpose is to condemn private property to a public use as conclusive.   They will look through any sham and see the truth, and the best evidence obtainable, whether documentary or oral understandings, will be received to show the real purpose."   Kansas City v. Hyde, 196 Mo. 498, 96 S. W. 201, 7 L. R. A. (N. S.) 639, 113 Am. St. Rep. 766;  State ex rel. Abel v. Gates, 190 Mo. 540, 89 S. W. 881, 2 L. R. A. (N. S.) 152;  Glasgow et al. v. St. Louis et al., 107 Mo. 198, 17 S. W. 743.

"The courts will declare an ordinance void for unreasonableness where it is oppressive, unequal, unjust, or altogether unreasonable."   City of Lamar v. Weidman, 57 Mo. App. 507.

"Where a regulation in order to make the prices possible would require an expenditure from which no reasonable return could be obtained at the rates provided in the contract, it is void." Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034.

"But certainly there is a limit in this regard over which Legislatures and municipalities cannot pass; they cannot, in the exercise of assumed police powers, violate charter contracts and overthrow vested rights. The limit to the exercise of the police power in these cases must be this: The regulations must have reference to the comfort, safety, or welfare of society; they must not be in conflict with any of the provisions of the charter; and they must not, under pretense of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise. Cooley, Const. Lim. (5th Ed.) 712." State ex rel. City of St. Louis v. Laclede Gaslight Co., 102 Mo. 472, 14 S. W. 974, 15 S. W. 383, 22 Am. St. Rep. 789.

One of the most illuminating cases upon this subject is that of Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, wherein was involved an ordinance upon its face apparently well within the police power of the city, apparently equal and impartial in its provisions, but which, from the facts, the court found was passed and operated for purposes of discrimination against the Chinese laundrymen of San Francisco. The court said:

"It is clearly within the just and constitutional limits of the legislative power to adopt any reasonable and uniform regulations, in regard to the time and mode of exercising that right, which are designed to secure and facilitate the exercise of such right, in a prompt, orderly, and convenient manner; nevertheless, such a construction would afford no warrant for such an exercise of legislative power, as, under the pretense and color of regulating, should subvert or injuriously restrain the right itself.

"The same principle has been more freely extended to the quasi legislative acts of inferior municipal bodies, in respect to which it is an ancient jurisdiction of judicial tribunals to pronounce upon the reasonableness and consequent validity of their by-laws. In respect to these it was the doctrine that every by-law must be reasonable, not inconsistent with the charter of the corporation, nor with any statute of parliament, nor with the general principles of the common law of the land, particularly those having relation to the liberty of the subject or the rights of private property. Accordingly, in the case of State of Ohio ex rel., etc., v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 262–300, an ordinance of the city council purporting to fix the price to be charged for gas, under an authority of law giving discretionary power to do so, was held to be bad, if passed in bad faith, fixing an unreasonable price, for the fraudulent purpose of compelling the gas company to submit to an unfair appraisement of their works.

"Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

"The determination of the question whether the proceedings under these ordinances and in enforcement of them are in conflict with the Constitution and laws of the United States necessarily involves the meaning of the ordinances, which, for that purpose, we are required to ascertain and adjudge."

This doctrine is still further elaborated by the Supreme Court in the case of Lochner v. New York, 198 U. S. 45–64, 25 Sup. Ct. 539, 546 (49 L. Ed. 937, 3 Ann. Cas. 1133), wherein it was said:

"It must, of course, be conceded that there is a limit to the valid exercise of the police power by the state. There is no dispute concerning this general

proposition. Otherwise the fourteenth amendment would have no efficacy, and the Legislatures of the states would have unbounded power, and it would be enough to say that any piece of legislation was enacted to conserve the morals, the health, or the safety of the people; such legislation would be valid, no matter how absolutely without foundation the claim might be. The claim of the police power would be a mere pretext—become another and delusive name for the supreme sovereignty of the state to be exercised free from constitutional restraint. This is not contended for.

"It is a question of which of two powers or rights shall prevail—the power of the state to legislate, or the right of the individual to liberty of person and freedom of contract. The mere assertion that the subject relates though but in a remote degree to the public health does not necessarily render the enactment valid. The act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate. * * *

"It is impossible for us to shut our eyes to the fact that many of the laws of this character, while passed under what is claimed to be the police power for the purpose of protecting the public health or welfare, are, in reality, passed from other motives. We are justified in saying so when, from the character of the law and the subject upon which it legislates, it is apparent that the public health or welfare bears but the most remote relation to the law. The purpose of a statute must be determined from the natural and legal effect of the language employed; and whether it is or is not repugnant to the Constitution of the United States must be determined from the natural effect of such statutes when put into operation, and not from their proclaimed purpose."

The doctrine of this case was followed and in all things approved by the Supreme Court of this state in the case of State v. Miksicek, 225 Mo. 561, 125 S. W. 507, 135 Am. St. Rep. 597.

"Depriving an owner of property of one of its essential attributes is depriving him of his property within the meaning of the constitutional provisions that no person shall be deprived of life, liberty, or property without due process of law. Rights guaranteed to a citizen by the Constitution cannot be abridged by legislation under the guise of a police regulation. The statute cannot escape censure by assuming the label of a police regulation. It has none of the elements or attributes which pertain to such a regulation, for it does not in terms or by implication promote, or tend or promote, the public health, welfare, comfort, or safety; and, if it did, the state would not be allowed under the guise and pretense of police regulation, to encroach or trample upon any of the just rights of the citizen, which the Constitution intended to secure against diminution or abridgment." State v. Julow, 129 Mo. 163, 31 Sup. Ct. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443.

"In order to sustain legislation of the character of the act in question, as a police measure, the courts must be able to see that its object in some degree tends towards the prevention of some offense or manifest evil, or has for its aim the preservation of the public health, morals, safety, or welfare. If no such object is discernible, but the mere guise and masquerade of public control, under the name 'of an act to regulate business and trade,' etc., is adopted, that the liberty and property rights of the citizen may be invaded, the court will strike down the act as unwarranted." State ex rel. Wyatt v. Ashbrook et al., 154 Mo. 375, 55 S. W. 627, 48 L. R. A. 265, 77 Am. St. Rep. 765.

"It is conceded that its acts must have such a relation to the public health that the courts by inspection can discern that they relate to and are convenient and appropriate to promote the public health, and are not mere arbitrary provisions which the courts can see have no natural connection with the professed purpose of subserving the public health." St. Louis v. Schuler, 190 Mo. 524–534, 89 S. W. 621, 622 (1 L. R. A. [N. S.] 928).

"Where the facts as to the situation and conditions are such as to establish the exercise of the police power in such manner as to oppress or discriminate against a class or an individual the courts may consider and give weight to such purpose in considering the validity of the ordinance. It is

well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity." Dobbins v. Los Angeles, 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169.

"An ordinance may be valid in its general purpose, but unreasonable and oppressive as applied to certain property." McQuillin on Municipal Ordinances, par. 186; Heman v. Ring, 85 Mo. App. 231–235.

"The ordinance must be reasonable as applied to the particular subject-matter." McQuillin on Municipal Ordinances, par. 186; City of Willow Springs v. Withaupt, 61 Mo. App. 275, 276.

"It may be stated, as a general proposition, that when a city makes a contract for a municipal improvement—e. g., conferring the right to introduce, distribute, and sell water within the city—it cannot, in derogation of its contract, by ordinance or otherwise, impose additional burdens upon the grantee or vary the conditions contained in the contract." McQuillin on Municipal Ordinances, par. 239; Los Angeles v. Los Angeles City Water Co., 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886.

"Such laws must be plainly appropriate to secure the end in view, which was itself legal and commendable. They must have direct relation to the public health and a direct and plain tendency to aid in the securing of it." People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465.

"Courts are not to be deceived by the mere phraseology in which an ordinance is couched when the action of the municipality in the light of the fact shows conclusively that it was passed for an unlawful purpose and not for the purpose therein stated." Michie's Ency. vol. 8, pp. 1010–1012; Postal Telegraph Cable Co. v. Taylor, 192 U. S. 64–73, 24 Sup. Ct. 208, 48 L. Ed. 342.

In the case of Kansas Natural Gas Co. v. Haskell (C. C.) 172 Fed. 545–558, the act provided for the exercise of eminent domain, the restriction of pressure in pipe lines in the state beyond an asserted danger point of 300 pounds; inspection and supervision, regulation of foreign corporations doing business within the state, all confessed to be police powers reserved in the state; but the court held that the purpose of the law after all, masked as it was, contemplated solely and chiefly the prevention of the exportation of gas from the state, and so an interference with interstate commerce. The court said:

"Does a state possess the constitutional power, derivable from any source whatever under our Constitution and laws, to prohibit, through its legislative assembly and lawfully constituted officials assuming to act in pursuance of its expressed will, the transportation of natural gas in interstate commerce, or persons from engaging in such enterprise in a lawful manner? For, unmasked and shorn of all pretexts, evasions, and subterfuges, this is beyond all cavil precisely what the act in controversy contemplates, and its enforcement, if valid, means; for it is both incomprehensible and inconceivable to our minds that it might even be thought by any one that another view of the act in question should be taken by a court, or that it might in the end be solemnly decreed that that which is abortive and ineffectual if attempted by direction shall become virile and impregnable to attack if sheltered behind such subterfuges, glossed by such pretexts, or coated with such evasions as are here employed."

This case was affirmed and quoted with approval in West v. Kansas Natural Gas Co., 221 U. S. 229, 31 Sup. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193, and the same principles are laid down by the Court of Appeals of this circuit in Haskell, Governor of Oklahoma, et al., v. Cowham (C. C. A.) 187 Fed. 403, 109 C. C. A. 235. The authorities in support of these principles are overwhelming in number and compelling in dignity, and the Supreme Courts of the United

States and of this state are foremost in their exposition. St. Louis v. St. Louis Theater Co., 202 Mo. 690, 100 S. W. 627; City of Rush-ville et al. v. Rushville Nat. Gas Co., 132 Ind. 575, 28 N. E. 853, 15 L. R. A. 321; City of Chicago v. Gunning System, 214 Ill. 628, 73 N. E. 1035, 70 L. R. A. 230, 2 Ann. Cas. 892; St. Louis Gunning Co. v. City of St. Louis, 235 Mo. 99, 137 S. W. 929; State ex rel. Haeuss-ler v. Greer, 78 Mo. 188; State ex rel. v. Corrigan Street Ry. Co., 85 Mo. 263, 55 Am. Rep. 361; Kansas City v. Corrigan, 86 Mo. 67; Sloan et al. v. Pacific R. Co., 61 Mo. 24–32, 21 Am. Rep. 397; State v. Fisher, 52 Mo. 174; Thompson, Judge in State v. Addington, 12 Mo. App. 214; Corrigan v. Gage, 68 Mo. 541; Louisville & N. R. Co. v. Railroad Commissioners of Tenn. (C. C.) 19 Fed. 679–689; Ritchie v. People, 155 Ill. 98, 40 N. E. 454, 29 L. R. A. 79, 46 Am. St. Rep. 315; Dillon on Municipal Corporations, pars. 591, 592, 716.

[5] V. We come now to the question of whether the court should stay the operation of this ordinance in the light of the law as thus disclosed and of the practically undisputed facts shown at the hearing. It appeared without dispute at the hearing, in fact it is practically ad-mitted, that during periods of low temperature, such as have been heretofore referred to, it is impossible for the complainant to comply with this penalty ordinance. It does not "control its source of supply." Its source of supply is the Kansas Natural Gas Company, a distinct, corporation with which it has a contract providing that the supply com-pany is bound "only to furnish such supply for such a period of time as the wells and pipe lines of the party of the first part and such other resources as the party of the first part shall be able to command are capable of supplying." And it is further expressly understood and agreed between them that the supply company shall not be liable for any loss, damage, or injury that may result either directly or in-directly from shortages or interruptions. The supply company is, however, held to use diligence to supply complainant with a constant and sufficient quantity of merchantable gas for all consumers. The diligence of that company was shown at these hearings by persuasive testimony, no part of which was controverted by defendants.

But even if it be conceded, which it cannot be, that the complainant company does either directly or indirectly control its source of supply from a legal standpoint, nevertheless it is powerless to compel the forces of nature. It appears overwhelmingly from the facts produced before this court that gas in sufficient volume does not exist reason-ably accessible to complainant, or elsewhere, to supply a constant pres-sure at all times and places as required by this ordinance; and, if it could be procured at all, it would be only at an expenditure so enor-mous and unreasonable as to amount to impairment of complainant's property and franchise rights.

This is practically conceded by counsel for defendants in their brief. They say:

"Complainant introduced evidence tending strongly to show that the supply of natural gas is failing, and that during extremely cold weather it cannot supply the demand. It is complainant's duty to do its utmost to furnish sat-isfactory service and a reasonably sufficient supply and pressure of gas. Complainant ought to be punished for failing in this duty."

Upon the facts in this case, this far shown to the court, these statements of counsel well-nigh "admit" the defendants out of court. The defense made no effort to show that complainant is able to comply with this ordinance under the circumstances stated by them, nor that it is willfully, negligently, or otherwise unlawfully failing, neglecting, or refusing to do so. We must conceive therefore that counsel for defendants stand squarely upon the proposition that under the franchise ordinance complainant's contract compels it to furnish gas in all desired quantities, at all times and places, and under all possible conditions. I have no doubt that this is the general impression in the minds of those who have not considered the nature of the substance involved and who are unfamiliar with the terms of the agreement between the city and the gas company. But reflection convinces us that this is not true.

It is well recognized that natural gas is more or less elusive, unstable, and uncertain. It is produced by nature in indeterminate quantities, not by man according to fixed and controllable laws of production. The rule respecting it is thus stated:

"If the supply in case of natural gas should fail, that would be a defense in case the company had made all effort to furnish the gas, for natural gas is no article that can be manufactured, and a quite different situation from an instance of supplying artificial gas is presented." Thornton on the Law Relating to Gas and Oil, par. 535, pp. 591, 592.

The franchise ordinance recognizes the limitations of the subject-matter. In section 5 it provides that the pressure which may be required of complainant must be not only reasonable but practicable—a provision which the agents of the city had voluntarily inserted in prior "model" ordinances.

Section 10, avowedly for the purpose of securing the correct measurement of gas furnished, and the proper pressure of gas to produce the best obtainable results, with least consumption, carefully provided that all this must be done "with due regard to the reasonableness and practicability of such pressure."

Section 14 made provision for that time when the supply of natural gas obtainable from sources "reasonably accessible" should, within the prescribed life of the ordinance, become inadequate to warrant the company in continuing to supply it. The contract between the original grantees and the supplying company expressly limiting the obligation to supply gas, when prevented by the caprice of nature, as heretofore quoted, is expressly made a part of the franchise contract between complainant and the city, in that, it was expressly approved by the city's legal department and agreement for its ultimate transfer to the city furnished as part of the franchise conditions. The provisions for forfeiture because of neglect to do any act by the franchise ordinance required, and for repeal because of failure to furnish gas in compliance with the provisions of the ordinance, each contain a saving clause of 60 days, within which the complainant may rectify its failures and continue substantial compliance. Both parties understood the nature of the subject-matter with which they were dealing. No municipality desires to impose unreasonable conditions, and no sane

contractor for public utilities would or could afford to accept such. It was well understood that natural gas would eventually fail, and that when it did it would do so by degrees and not abruptly. What the grantees under this franchise ordinance agreed and contracted to do was to use all reasonable diligence and make all reasonable expenditure necessary to furnish to the inhabitants of Kansas City such natural gas as they might need and desire for illuminating, heating, and mechanical purposes under any reasonable and practicable pressure, which gas must at all times be of the same character and quality as when it comes from the earth and not be mixed with air or otherwise adulterated.

But the defendants say that during most of the year, for all but five or six weeks, and part of the time during that short period, the company can and does maintain the pressure required by this ordinance. Therefore, if it can be and is maintained for the greater part of the time, it is a practicable and reasonable provision and cannot be declared void in this or any other proceeding; but, for such occasions as the facts show it to be unreasonable, complainant must be left to its defense in prosecutions instituted in the municipal courts. As we have already seen, an ordinance may be valid in its general purpose, but unreasonable and oppressive as applied to certain property. It must be reasonable as applied to the particular subject-matter. The police power must not be exercised in such manner as to oppress or discriminate against a class or an individual. It is conceded by counsel that:

"Courts will declare an ordinance unreasonable upon a showing of a state of facts which makes it unreasonable. And an ordinance may be reasonable and valid in its application to some streets and void as to its application to other streets or other parts of the same street." St. Louis v. St. Louis Theater Co., 202 Mo. 690, 100 S. W. 627; Pennsylvania R. Co. v. Jersey City, 47 N. J. Law, 286; Chicago v. Gunning System, 214 Ill. 628–641, 73 N. E. 1035, 70 L. R. A. 230, 2 Ann. Cas. 892.

The issues in these cases involved matters like bill-board or hanging-sign ordinances, which are reasonable as applied to congested portions of the city and unreasonable in other localities; ordinances affecting the speed of trains, reasonable in thickly settled districts and unreasonable in sparsely settled suburbs. Here the law is practical in operation and distinguishes between the localities involved. Can it be said that it cannot be equally operative when periods of time are involved? Is there redress for oppression in one case and not in the other? It has been said by the courts that the fact that a municipal court, from the very nature of its functions, could not deal comprehensively with an offense under a penalty ordinance, challenged as involving the improper exercise of the rate making power, would, without more, justify the intervention of a court of equity where the rights of the parties can be more perfectly adjudicated. The same principle would apply quite as fully to a case like the present where propositions must be considered and determined far beyond the scope and province of a municipal court.

But no such consideration as that stated by defendants' counsel is

presented in this case. It was not contended at the argument that the complainant has neglected or refused to maintain the desired pressure, when it was possible for it to do so, nor was there a shred of evidence to that effect. On the contrary, it was asserted and contended that it could comply with the ordinance and did so at all times except when the temperature was so low as to make compliance impossible. The facts were all known to every department of the city at the time this amended ordinance was passed. It is significant that the council waited to impose the penalty clause until a time of year and unusually low temperature in this locality, even for that season made it apparent in the light of expert information and past experiences that the gas company could not comply with its terms. We cannot close our eyes to this obvious fact. No matter what may have been the past misdeeds of the complainant, and none are disclosed, that have contributed appreciably, if at all, toward the present unsatisfactory condition of pressure, it cannot, of course, be supposed that the council intended to pass a retroactive measure. The only office of this penalty amendment—and we are forced in the light of all the surrounding circumstances to conclude that this was the motive in the minds of its framers—would be to punish the gas company for something beyond its power to remedy. It must be conceded that the measure is in no sense appropriate or adapted to correct the evil, nor to contribute in the slightest degree to the health, safety, comfort, or welfare of the community. It is entirely inoperative to restore the requisite volume of gas to exhausted fields. It is therefore a police measure, if one at all, in name only, and not in substance and effect. Furthermore, having been framed under such conditions as to compel the conclusion that it was passed for an ulterior purpose, it falls directly within the principle announced by the Supreme Court of the United States in Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, heretofore fully discussed. It is directed at a single corporate citizen under circumstances which make its operation and intended operation unjust and oppressive. This finding does not and is not intended to interfere with any proper exercise of the police power of the city or other form of legitimate regulation and supervision. As was said by the court in Kansas Natural Gas Co. v. Haskell (C. C.) 172 Fed. 545–571:

"It is not intended, by anything said in the course of this opinion, to either hold or intimate the state does not possess the power to supervise, control, and regulate in a reasonable manner the method of construction and manner of laying and maintaining pipe lines to be employed in the transportation of natural gas in interstate as well as intrastate commerce, for the purpose of preserving the health and promoting the safety of its citizens and safeguarding the public against accident which may result from the conduct of a business in which a highly inflammable, dangerous, and volatile product is transported. The right of reasonable inspection, supervision, and control, commensurate with the attendant danger, the state has and should exercise in its reserve police power. What we do say, and intend to be understood as saying and meaning, is this: All such regulations must be reasonably adapted and necessary to accomplish the end sought, and the result or end sought to be attained must be such as falls within the scope of the power residing in the state. * * *

"It must not be exerted in disguise for the purpose of denying any person within its jurisdiction the equal protection of the laws, or deny any such person his just property rights without due process of law."

And it may further be said that it cannot be exercised under the empty pretext of contributing to the public health and safety, to which it bears no possible relation, for the indirect and improper purpose of enforcing a false construction of the contract obligations of the complainant.

There can be no doubt that the complainant company is required to make full and substantial compliance with the terms of its contract. It must furnish all the gas it can, and as long as it can, within the terms of its contract, and it must so conduct its business as to protect the public from injuries for which it is legally responsible. If it is sincerely believed that the business of furnishing natural gas to the people of this city under conditions existing cannot be conducted without grave danger and suffering to the community, then a more practical police regulation, and one comporting more with the exigencies of the case, would be one prohibiting the complainant from furnishing natural gas at all under such conditions. This would be effective, and would be a police regulation in fact as well as in name, provided the situation is serious enough to warrant such a drastic measure.

This leads us to consider briefly what safeguards are incorporated in the franchise contract itself as measures of protection both to the community and the franchise holder. They are not few in number. By section 10 an elaborate system of inspection is provided. By section 17 forfeiture, involving the suspended franchises to furnish artificial gas, is the penalty for failure, refusal, or neglect to fulfill the requirements of the ordinance for so long a period as 60 days. By section 20 the city reserves the right to purchase and to operate the plant itself under conditions therein named, which right shall become immediately operative, even before the expiration of the 10-year period, if complainant ceases to furnish natural gas as required by the contract. By section 21 the city reserves the right to grant gas franchises to others. By section 22, to repeal the ordinance entirely upon substantial and continued failure for a period of 60 days to furnish gas in compliance with its provisions; and further to own and operate a plant or plants itself to supply the city or inhabitants with natural or artificial gas for any purpose, or to furnish any other sort of light. The city reserves its right of governmental control and all its general rights in law or equity. Reasonably exercised and applied to a proper state of facts, these reserved remedies are sufficient to protect the city and consumer alike. One other provision of the contract deserves fuller consideration; this is section 14, which provides that:

"Should the supply of natural gas obtainable by grantees reasonably accessible, be, at any time hereafter during the life of this ordinance, inadequate to warrant them in continuing to supply natural gas under the terms of this ordinance, or should the common council of Kansas City so find at any time (and in the event of a disagreement as to the facts in this respect either party or a gas consumer may have recourse to the courts to establish the facts), they shall not be longer required to do so."

This provision was evidently intended to meet a situation something like the present one, which must have been anticipated in view of the nature of the substance contracted to be furnished. As has been said, it was known from the first that the supply of natural gas would eventually become exhausted. In the nature of things it would begin to fail gradually; and a point would inevitably be reached when the problem to be solved by the city and company alike would be, when the continued use of natural gas for heating, illuminating, and mechanical purposes was no longer of advantage to either party, neither party would lightly seek to terminate the contract. The gas company would presumably desire to continue so long as it might do so at a profit. The city and its people would desire to continue the use so long as it contributed in a large degree to the general comfort and convenience. In case the parties are unable to agree, provision is made that appeal may be made by either, or in default thereof, by any consumer of gas, to the courts for a determination of whether under all the circumstances it is profitable or warrantable to cease furnishing on the one hand, or to insist upon continuance on the other. The law requires that gas must be furnished impartially to all who desire to use it; manifestly, as the quantity decreases, all cannot at all times and under all circumstances have as much as some may desire. It is not the only form of illumination that may be used or that is used. It is not the exclusive fuel employed. It is comfortable, it is convenient; and it is highly satisfactory or less so according to circumstances. It is a practical business question to be decided when we have reached a point where it must be continued and used in a restricted sense, or where it must be discontinued altogether.

In either event, private consumers must, of course, adapt their instrumentalities of consumption to the changing circumstances. The gas company would scarcely be justified in seeking to return to artificial gas, with its higher price and its more limited utility, while the city and the people felt that the supply remaining was still too valuable to be cast aside. But, if it continues the supply, may we legally construe the contract to mean that it must maintain its investment, its operating expenses, discharge its obligations to its supply companies, and at the same time that the obligations of the contract on the part of the city may be repudiated and the complainant be vexed by profitless litigation? If the city believes that the time has come when the change contemplated by the contract should be effected, it should institute proceedings to that end. Should the irreconcilable and indeterminable condition now contended for be insisted upon, the complainant would necessarily have to avail itself of this provision of the contract. It seems to the court that both parties should face the situation fairly as it presents itself. The gas company asserts that it stands ready to continue furnishing natural gas to the best of its ability, if that is desired. It would seem desirable that, so far as practicable, the wishes of the people of this community as to the continued use of natural gas in view of existing conditions be ascertained Their representatives should decide this question and act accordingly. No right-minded man desires to impose unreasonable hardships upon

public service corporations. No one wants a public utility to be furnished at less than it is reasonably worth. The people, if they are placed fully and conscientiously in possession of the facts, may be relied upon to deal justly and fairly with all questions of this nature.

If, in making these suggestions, the court seems to have exceeded the limits of its legitimate functions, its apology must be that the question involved is deemed to be one of paramount importance, and it is felt that so complex a matter should be dealt with in a broad spirit, keeping in mind the extensive rights involved on both sides. That a solution should not be attempted by means of narrow policies which fall far short of accomplishment, and tend toward injustice, dissatisfaction, and unrest. This discussion has been long and burdensome to the court, and it may be felt generally wearisome; but it must be remembered that in this case the entire people of this city are parties directly or indirectly. It is proper that they should know what the facts are, what the court decides, and the reasons upon which the decision is based; because it is only through candor and full understanding that public questions affecting so intimately the entire body of the people may be resolved and determined with regard alike to the administration of justice and the maintenance of law.

[6] VI. It is submitted by the defense that the restraining order was improvidently issued in so far as the two cases alleged to have been pending when the bill was filed are concerned. Complainant insists that these cases were not legally pending "because there was no ordinance prescribing any way to serve a corporation with summons in a suit to collect a fine for violating a city ordinance until January 4, 1912, and these two alleged suits were filed on December 28, 1911."

Section 720 of the Revised Statutes (U. S. Comp. St. 1901, p. 581) provides that:

"The writ of injunction shall not be granted by a court of the United States to stay proceedings in a court of a state, except in cases where such injunction may be authorized by any law relating to proceedings in bankruptcy."

Provisions of this section relate only to the stay of proceedings begun in the courts of a state before any resort to the United States Court. Lanning v. Osborne et al. (C. C.) 79 Fed. 657–662, and cases cited. The municipal court of Kansas City is a court of the state within the meaning of the statute. By charter and ordinances passed thereunder, that court is given jurisdiction of violations of ordinances or other regulations of the city, for the breach of which any fine or penalty is imposed. These two cases were filed December 28, 1911. In Missouri civil cases are deemed to be begun when petitions are filed (South Missouri Lumber Co. v. Wright, 114 Mo. 326, 21 S. W. 811), and a prosecution for the violation of a city ordinance is begun when the prosecuting officer of the city files his affidavit or information (City of Pilot Grove v. McCormick, 56 Mo. App. 530). It must be conceded therefore that these cases were pending at the time complainant's bill was filed in this court; but at that time the only process provided in such cases before municipal courts was a warrant for arrest. This was concededly an inappropriate form of process to secure

jurisdiction over a corporation against which a fine only could be assessed. January 2, 1912, the common council, to supply this defect, provided for service upon corporations in such cases by summons, as in civil cases. This ordinance was approved January 4th following. The bill in this case was filed late in the afternoon of January 4th. It would appear therefore that, at the time this proceeding was instituted in the federal court, the two cases were pending in the municipal court, and that that court was provided with a form of process available for purposes of jurisdiction although not yet served. While the rule of jurisdiction in the federal courts differs from that in the state courts, nevertheless, in determining whether a case is pending in the state court, we must recognize the procedure prevailing in the state jurisdiction. I am therefore of the opinion that these cases were pending in a court of the state, within the meaning of section 720 of the Revised Statutes, at the time the restraining order was issued, and that as to those two cases that order must be dissolved.

[7] VII. There remains to consider whether the suit subsequently brought by defendants in the state court produces a conflict with a prior jurisdiction of the same parties and subject-matter in this court, and whether the injunctive process of this court should be extended to restrain defendants from prosecuting that suit until the issues in this case have been finally determined. The rule is well settled that, where the jurisdiction of a court of the United States has attached, the right of the plaintiff to prosecute his suit in such court to a final determination there cannot be arrested, defeated, or impaired by any subsequent action or proceeding of the defendant respecting the same subject-matter in a state court. Mr. Justice Field, in Sharon v. Terry (C. C.) 36 Fed. 337:

"It is a doctrine of law too long established to require a citation of authorities that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, till reversed, is regarded as binding in every other court; and that, where the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. These rules have their foundation, not merely in comity, but on necessity. For, if any one may enjoin, the other may retort by injunction, and thus the parties be without remedy; being liable to a process for contempt in one, if they dare to proceed in the other. Neither can one take property from the custody of the other by replevin or any other process, for this would produce a conflict extremely embarrassing to the administration of justice." Peck v. Jenness, 7 How. 612–624, 12 L. Ed. 841; Moran v. Sturges, 154 U. S. 256–269, 14 Sup. Ct. 1019, 38 L. Ed. 981.

In Starr et al. v. Chicago, R. I. & P. Ry. Co. et al. (C. C.) 110 Fed. 3, Judge Sanborn said:

"Wherever a federal court and a state court have concurrent jurisdiction, the tribunal whose jurisdiction first attaches holds it to the exclusion of the other until its duty is fully performed and the jurisdiction involved is exhausted. * * *

"The court which first obtains jurisdiction of the subject-matter and of the necessary parties to a suit may, and if it discharges its duty it must, if necessary, issue its injunction to prevent any interference by any one with

its effectual determination of the issues, and its administration of the rights and remedies involved in the litigation."

The Supreme Court, in Harkrader v. Wadley, 172 U. S. 148, 19 Sup. Ct. 119, 43 L. Ed. 399, states the proposition thus:

"When a state court and a court of the United States may each take jurisdiction of a matter, the tribunal where jurisdiction first attaches holds it, to the exclusion of the other, until its duty is fully performed and the jurisdiction involved is exhausted; and this rule applies alike in both civil and criminal cases."

See, also, Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764.

In United States v. Eisenbeis et al. (C. C. A.) 112 Fed. 190, 50 C. C. A. 179, the court said:

"The general rule is well settled that, where different courts have concurrent jurisdiction, the court which first acquires jurisdiction of the parties, the subject-matter, *the specific thing*, or the property in controversy, is entitled to retain the jurisdiction to the end of the litigation, without interference by any other court. It is the duty of the court which first obtains *full and complete* jurisdiction over the *whole* case to keep control of it, to the exclusion of the other court that had not obtained such full jurisdiction and to grant the relief prayed for. This general principle is well settled. The only difficulty lies in its application to the facts of any given case."

And so it is said in Prout v. Starr, 188 U. S. 537–544, 23 Sup. Ct. 398, 47 L. Ed. 584:

"The jurisdiction of the Circuit Court could not be defeated or impaired by the institution, by one of the parties, of subsequent proceedings, whether civil or criminal, involving the same legal questions, in the state court."

In Rodgers v. Pitt (C. C.) 96 Fed. 668–670, the reason of the rule is thus emphasized:

"This rule is important to the exercise of jurisdiction by the courts whose powers are liable to be exerted within the same spheres and over the same subjects and parties. There is but one safe road for all the courts to follow. By adhering to this rule, the comity of the courts, national and state, is maintained, the rights of the respective parties preserved, and the ends of justice secured, and all unnecessary conflicts avoided. Any other rule would be liable at any time to lead to confusion, if not open collision, between the courts, which might bring about injurious and calamitous results. This rule is elementary law, and a citation of all the authorities in its support would be endless and useless."

Where the federal questions raised by the bill are not merely colorable but are raised in good faith and not in a fraudulent attempt to give jurisdiction to the Circuit Court, that court has jurisdiction, and can decide the case on local or state questions only, and it will not lose its jurisdiction of the case by omitting to decide the federal questions or deciding them adversely to the party claiming their benefit. Siler et al. v. Louisville & Nashville R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753; Risley et al. v. City of Utica et al. (C. C.) 179 Fed. 875–882. The Supreme Court of the United States many years ago addressed itself to this question with a view to pointing out the distinctions which must be observed in the practical application of the principle.

In Buck v. Colbath, 3 Wall. 334, 18 L. Ed. 257, Mr. Justice Miller said:

"The rule that, among courts of concurrent jurisdiction, that one which first obtains jurisdiction of a case has the exclusive right to decide every question arising in the case, is subject to some limitations; and is confined to suits between the same parties, or privies, seeking the same relief or remedy and to such questions or propositions as arise ordinarily and properly in the progress of the suit first brought; and does not extend to all matters which may by possibility become involved in it.

"It is not true that a court, having obtained jurisdiction of a subject-matter of a suit, and of parties before it, thereby excludes all other courts from the right to adjudicate upon other matters having a very close connection with those before the first court, and, in some instances, requiring the decision of the same questions exactly.

"In examining into the exclusive character of the jurisdiction of such cases, we must have regard to the nature of the remedies, the character of the relief sought, and the identity of the parties in the different suits."

In Watson v. Jones, 13 Wall. 679–715 (20 L. Ed. 666), the same learned justice said:

"When the pendency of such a suit is set up to defeat another, the case must be the same. There must be the same parties, or at least such as represent the same interest, there must be the same rights asserted, and the same relief prayed for. This relief must be founded on the same facts, and the title or essential basis of the relief sought must be the same. The identity in these particulars should be such that, if the pending case had already been disposed of, it could be pleaded in bar as a former adjudication of the same matter between the same parties."

In Knott v. Evening Post Co. (C. C.) 124 Fed. 342–356, Evans, District Judge, said:

"It has never been doubted that a second suit brought by the same plaintiff against the same defendant on the same cause of action in courts of the same sovereignty would be defeated by a plea in abatement, but this is not, unless in a very remote sense, upon the ground that the court in which the first suit was brought acquired jurisdiction to the exclusion of all others, but is primarily upon the ground that a defendant should not be vexed by two such suits at the same time. Where the two suits, however, are in courts of different sovereignties, the rule does not apply, according to the doctrine of the courts of the United States. Gordon v. Gilfoil, 99 U. S. 169 [25 L. Ed. 383]."

The Court of Appeals for this circuit, in a number of cases, has given this subject careful analysis. In Ogden City v. Weaver, 108 Fed. 564, 47 C. C. A. 485, the situation presented and the adjudication made are thus stated in the syllabus:

"The pendency in a state court of a suit in equity to determine the validity of a contract and the rights of the parties thereunder does not deprive the federal court of jurisdiction to entertain an action at law between the same parties brought by the defendant in the suit in the state court to recover a sum claimed to be due under such contract; the suit at law not being one which affects the custody of property, either actually or constructively."

Judge Thayer, speaking for the court, on page 567 of 108 Fed., on page 488 of 47 C. C. A., of the reported case, further says:

"It is urged, however, in behalf of the defendant city, that if the decree which it has secured in the state court is interlocutory and not final, and for that reason cannot be invoked in support of its plea of res judicata,

nevertheless the mere pendency of the case in the state court should have induced the trial court to suspend all proceedings in the case at bar until the action in the state court was finally heard and determined. This contention, however, is based upon a misconception of the character of the present proceeding, which is an action at law, in personam, to recover a sum of money due under a contract. It is not a case which affects the custody of any property over which the state court has first acquired jurisdiction. Neither is it a case which involves any interference with the orderly conduct of the litigation in the state court. It is simply one of those cases, such as frequently occur, where a state court and a federal court, in the exercise of a jurisdiction which rightfully belongs to each, are called upon to determine the same question, and the fact that they may disagree and decide the question differently in no wise interferes with the right of either to proceed. It is well settled that the fact that a suit upon a cause of action is pending in a state court will not sustain a plea of lis pendens to a suit upon the same cause of action subsequently filed in a federal court. Stanton v. Embrey, 93 U. S. 548 [23 L. Ed. 983]; Insurance Co. v. Harris, 97 U. S. 331 [24 L. Ed. 959]; Buck v. Colbath, 3 Wall. 334–345 [18 L. Ed. 257]; Standley v. Roberts, 59 Fed. 836 [8 C. C. A. 305]. The rule is quite different, of course, when, after a suit is brought in a state court which affects the custody of property, or at some stage of the proceeding may affect its custody, a suit of a like nature is subsequently brought in a federal court."

The subject is still further and more elaborately discussed by Judge Sanborn in Guardian Trust Co. v. Kansas City Southern Ry. Co. (C. C. A.) 171 Fed. 43, 96 C. C. A. 285, 28 L. R. A. (N. S.) 620. He says:

"Even if the subsequent actions at law were between the same parties and involved the same cause of action, as they do not, these facts would furnish no ground for an injunction against their prosecution. The existence of an earlier suit in equity between the same parties for the same cause in one jurisdiction will not sustain a plea in abatement or an injunction to stay the prosecution of a later action at law in another jurisdiction, where the prosecution of the later action does not prevent the determination of the issues and the administration of the rights and remedies involved in the former suit. Insurance Co. v. Brune's Assignee, 96 U. S. 588–593, 24 L. Ed. 737; Franklin v. Conrad-Stanford Co., 70 C. C. A. 171–175–178, 137 Fed. 737–741–744; Ogden City v. Weaver, 47 C. C. A. 485–489, 108 Fed. 564–568."

The learned judge quotes from Insurance Co. v. Brune's Assignee, supra, as follows:

"Certain it is that the plea of a suit pending in equity in a foreign jurisdiction will not abate a suit at law in a domestic tribunal. This was shown in a very able decision made by the Supreme Court of Connecticut, in Hatch v. Spofford, 22 Conn. 485, 58 Am. Dec. 433, where the authorities are learnedly and logically reviewed. See, also, Colt v. Partridge, 7 Metc. (Mass.) 570, and Blanchard v. Stone, 16 Vt. 234.

"If, then, a bill in equity pending in a foreign jurisdiction has no effect upon an action at law for the same cause in a domestic forum, even when pleaded in abatement; if, still more, it has no effect when pleaded to another bill in equity, as the authorities show—it is impossible to see how it can be a basis for an injunction against prosecuting a suit at law. It follows that the refusal of an injunction by the Circuit Court was not erroneous."

It will thus be seen that the same rule applies to proceedings in equity as to actions at law. Adverting to the language of Judge Thayer, just quoted, to the effect that the fact that a suit upon a cause of action in a state court will not sustain a plea of lis pendens to a suit

upon the same cause of action subsequently filed in a federal court, Judge Sanborn further says:

"It is equally true that the fact that a suit upon a cause of action is pending in a federal court will not sustain a plea of lis pendens to a suit upon the same cause of action subsequently filed in a state court.

"These decisions of the Supreme Court and of this court answer many arguments of counsel in support of this injunction. They establish the propositions that the averments in the equity suit of no indebtedness of the Belt Company and of the invalidity of the notes, together with the prayers for the accounting and for the cancellation of these notes, did not withdraw from the jurisdiction of the state court or prevent the trial in that court of the issue of debt or no debt in the subsequent actions at law therein, for that question was adjudged in the cases of Brune's Assignee and of Ogden City. * * *

"This case falls far within the unquestioned rule that the pendency in a state or other court of an action in personam which involves no claim to or lien upon specific property in the possession or under the dominion of a national court of equity, and no issue of which that court has acquired exclusive jurisdiction, presents no ground for a dependent bill to stay it."

These rulings of the Supreme Court and the Court of Appeals for this circuit are determinative of this question in the case at bar. It may be conceded that the parties to this proceeding, and to that in the state court, are essentially the same. This court first acquired such jurisdiction, as it did acquire, but the causes of action are not identical, although they do involve, in a general way, the same subject-matter, and in both similar questions are incidently presented for decision. The relief asked is essentially different. The bill in this court prays:

First:

"That said pressure ordinances above set forth, approved May 23, 1910, and December 14, 1911, and each of them, and any other similar ordinance which the defendant city may pass, be declared unconstitutional, unenforceable, void and not binding upon your orator."

Second: That defendants be permanently enjoined and restrained from taking any further steps in any suits heretofore instituted, or that may be instituted, to enforce or recover penalties for the alleged violation of said ordinances.

In the state court the complainant prays an accounting between the gas company and the city, and all consumers of gas, in order that it may be determined what is a fair, just, equitable, and reasonable value of the gas furnished to said consumers under the circumstances and conditions existing. and that the gas company in the meantime be restrained from charging or collecting from its consumers any sum for the supply of natural gas, and from shutting off the supply of gas to consumers in default of payment; while in this court the invalidity of the ordinance is asserted because of the unreasonableness and impracticability of the pressure exacted, and in the state court the alleged diminished value of the gas is founded largely upon alleged defective pressure, nevertheless a complete determination as to the validity of these ordinances, and the enforcement of any decree pursuant to such determination, can be effectuated in this court, without curtailment, by, or interference from, any decree of the state court, under the issues there framed, and without involving the contractual

question of the price which the complainant in this suit is entitled to charge for the gas it furnishes. It may be that the conclusion reached in this case, involving the reasonableness of pressure, would seem to indicate the injustice of a contrary decision in some other jurisdiction, which incidently involved the reasonableness of the same requirements of pressure, and vice versa; but that would not affect the decision of this court upon the question specifically before it, nor impede its process, nor the final execution of its decree.

No diversity of citizenship is present. Therefore this court acquires jurisdiction solely by reason of the federal questions presented; that is, the impairment of contract and the taking of property, without due process of law, by the passing of a law—in this case, an ordinance, by an agency of the state. It has no general jurisdiction over other matters of dispute between complainant and the city involving the ordinance-contract. It may, or may not, be that in connection with and incidental to the federal questions involved complainant might have framed issues involving purely local questions; and if it could have done so, and had done so, this court, having acquired jurisdiction of the case, through the presence of substantial federal questions, might have decided the local questions as well, even to the exclusion of the federal questions involved. But no such situation is presented by the pleadings in this case. It is doubtful if the scope of the bill is sufficient to sustain an amendment for that purpose; but, even if it were, and such an amendment were necessary to support an enlarged jurisdiction in this court, it could not now operate to oust a jurisdiction in the state court which has already attached prior to such amendment. I am therefore constrained to hold that this court cannot, with propriety, seek to restrain the defendants from prosecuting their suit in the state jurisdiction. It is not to be conceived that the issues there pending will be ultimately resolved otherwise than in accordance with just principles. The rights of the complainant, under its ordinance-contract with the city, are matters of law that must appear upon the face of the record, and either party to that suit may have any decree reviewed upon appeal to the Supreme Court of the United States, if so desired.

It will be borne in mind that this is an interlocutory hearing and that the action of the court is based entirely upon the showing thus far made. However, in view of the completeness of that showing, and of the attitude of the parties at that hearing, I have deemed it advisable that these preliminary findings and discussions should be made full and explicit in order that the issues may be well defined, and that both parties may know with certainty what the views of the court are upon the legal questions involved, and the nature of the evidence that must be controlling in the final disposition of the case. I have in mind further that, under section 129 of the Judicial Code, either party may, if it desires, speedily have the rulings of this court reviewed by the Circuit Court of Appeals; that appeal may be taken within 30 days from the entry of this order, and will take precedence in the appellate court. It is entirely practicable that the questions here involved may be heard at the May term of the Court of Appeals.

for this circuit, and thus the way may be cleared for a final settlement of this dispute before the approach of another winter brings a recurrence of the difficulties which gave rise to this litigation.

It follows that the demurrer to the bill must be overruled; that the defendants, and each of them, will be enjoined and restrained from taking any further steps to enforce or recover penalties for the alleged violations of said pressure ordinances approved May 23, 1910, and December 15, 1911, and from instituting, or permitting any such suits to be instituted or prosecuted against this·complainant, or assisting directly or indirectly in the prosecution of any such suit or suits, or taking any steps whatever to enforce such ordinances until the further order of this court. An appropriate order may be prepared in accordance with this opinion, and this cause is continued for further proceedings upon the merits.